ANDERSON, CLAYTON & CO., d/b/a Acco Feeds, Plaintiff-Appellant,

v.

FARMERS NATIONAL BANK OF CORDELL, Defendant-Appellee.

No. 78–1557.

United States Court of Appeals, Tenth Circuit.

Argued Jan. 22, 1980.

Decided May 28, 1980.

Rehearing Denied Aug. 4, 1980.

John E. Sargent, Jr., Oklahoma City, Okl. (John N. Hermes, Oklahoma City, Okl., and of counsel, McAfee, Taft, Mark, Bond, Rucks & Woodruff, P. C., Oklahoma City, Okl., with him on brief), for plaintiff-appellant.

Lee B. Thompson, Oklahoma City, Okl. (Wesner & Wesner, Cordell, Okl., with him on brief), for defendant-appellee.

Before HOLLOWAY, BREITENSTEIN and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This is a hog feed case. Acco, the plaintiff below, was a feed seller. Acco appeals an unfavorable judgment rendered by the United States District Court for the Western District of Oklahoma, Chief Judge Daugherty. Money damages were awarded to Acco in the amount of $5,083.63. It had filed an action on a cashier's check in the amount of $29,000 which was drawn by the defendant, the Farmers National Bank of Cordell.

## SUMMARY OF THE FACTS

Both Acco and the bank claimed a security interest in hogs owned and fed by Jerry Slatton. Two groups of Slatton hogs are involved in this action. Group 5 hogs were purchased by Slatton with funds loaned from a bank which is not involved in this action. Group 6 hogs were purchased with funds loaned by the bank involved sued here. In connection with this loan, the bank obtained a security interest in the group 6 hogs. Acco supplied feed to Slatton for both groups of hogs on credit and also held a security interest in the hogs.

The trial court found that Acco informed the bank when the group 6 hogs were purchased that it would not supply feed for those hogs on credit unless the bank agreed to subordinate its security interest in those hogs to Acco's security interest. The bank agreed to subordinate its interest. Acco mailed a subordination agreement to the bank. The president of the bank, Mr. Wesner, signed the agreement without reading it. The terms of the written agreement which he signed provided that the bank subordinated its security interest in group 6 hogs to Acco's security interest for feed provided for *all* of Slatton's hogs. At the time Slatton owed Acco $35,000 for feed provided for group 5 hogs. Under the terms of the written agreement Acco would receive payment for the feed provided to group 5 and group 6 hogs before the bank received any payment for the purchase money loaned on the group 6 hogs. At trial the bank contended that the intent of the parties was that the bank would subordinate its security interest *only* to Acco's security interest for feed provided for group 6 hogs and that the bank's security interest was not to be subordinated to Acco's security interest arising for the feed provided for group 5 hogs.

In November of 1976, Slatton sold some of the group 6 hogs and tendered a $29,000 check to Acco drawn on his checking account with the bank in partial payment of the feed account with Acco. Slatton had deposited $29,000 in funds obtained from the sale of the group 6 hogs with the bank,

but before the check to Acco was cashed the bank had applied the funds against the debt Slatton owed the bank. Subsequently, the bank learned that Slatton had sold additional group 6 hogs for $41,000. The bank believed, according to the evidence, that the $41,000 was available to pay down the balance on Slatton's debt. This was a mistaken belief. It was Acco which under the express terms of the contract with the bank had the priority interest in this sum. The bank, acting on its mistaken assumption, issued a cashier's check to Acco in the amount of $29,000. Acco signed a statement at that time which said that after crediting the $29,000, only $5,000 remained to be paid by Slatton on the feed. The bank was, at the time, unaware that Acco had arranged to receive the $41,000 proceeds of the group 6 hogs. This was the money which the bank had assumed it would receive and apply to Slatton's debt to the bank after deducting the $5,000 still owing Acco on its group 6 feed account. When the bank learned the true facts (that it was victimized), it stopped payment on the $29,000 cashiers check. After that the present controversy got under way.

In its action, Acco sought recovery on the $29,000 check, as we stated above. It claimed that the issuing bank had unlawfully stopped payment. The bank in turn requested reformation of the written subordination agreement so as to reflect the verbal agreement between the parties that the bank's security interest would be subordinated to Acco's security interest in group 6 hogs only.

Judge Daugherty concluded that in equity the subordination agreement should be reformed to correspond to the claimed verbal agreement of the parties because of mistake on the part of the bank and because of inequitable conduct which the Judge found existed on the part of Acco. It was the court's theory that Acco's inequitable conduct consisted of not disclosing to the bank the existence of the group 5 hog feed bill and the mailing of a written subordination agreement which was broader in its terms than orally agreed to by the par-

ties, which agreement subordinated the bank's lien to a lien for hog feed in which the bank was in no way concerned. The trial court held that reformation of the contract was not barred by the bank president's failure to read the written agreement before signing it.

The court also ruled that the bank had the right to stop payment on the cashier's check in view of the fact that the check had been fraudulently obtained by a payee which had dealt directly with the bank in a fraudulent way. The court further found that Acco had falsely represented that the bank's payment of the $29,000 would leave a balance due on Slatton's hog feed account of only $5,000.

The trial court also determined the application to the various hog feed accounts of $5,000 received by Slatton from Rodeo Meats for unrelated services which was paid to Acco by Slatton to reduce the hog feed bill. Judge Daugherty ruled that the money should be proportionally divided between the group 5 and group 6 hog feed accounts. The Judge's ruling was not appealed, but has to be taken into account inasmuch as it does affect the calculation of damages owed to Acco by the bank.

The damage issue was determined by concluding that Acco's security interest in group 6 hogs had priority over the bank's security interest in group 6 hogs. The bank's security interest in the group 6 hogs was given priority over Acco's security interest for the hog feed for group 5 hogs. It was found that Acco's total bill for feed on Slatton's group 6 account was $49,085.08. This account was credited $40,901.45, the amount Acco received when the last of the group 6 hogs were sold, and $3,100, the proportionate part of the $5,000 Rodeo Meats payment applied to the group 6 account. A balance of $5,083.63 was due Acco on the group 6 account. Acco was entitled to full payment on the group 6 hog account prior to the bank's right to receive funds to satisfy Slatton's purchase money debt for the group 6 hogs. The bank had already received $29,000 in proceeds from the sale of group 6 hogs before Acco was

fully satisfied, so the court assessed damages against the bank in favor of Acco in the amount of $5,083.63 plus interest.

## ISSUES RAISED ON APPEAL

Acco asserts first that reformation of the written subordination agreement was error for two reasons. It is claimed that reformation is not available because the bank president's negligence in failing to read the written agreement was the cause of the bank's mistake. In addition, it is argued that Acco did not engage in inequitable conduct sufficient to support reformation.

Acco's second major contention on appeal is that the court erred in holding that the bank had the right to stop payment on the cashier's check. Acco argues that the bank had already accepted the check and that there was no fraud on Acco's part in obtaining the check from the bank.

## DISCUSSION

### A. *REFORMATION*

■ Reformation of a written contract to conform to a prior oral agreement is allowed under Oklahoma law. A unilateral mistake will justify reformation of a contract where the other party commits fraud or engages in inequitable conduct. *Boettler v. Rothmire*, 442 P.2d 411 (Okl.1968); *Newbern v. Gould*, 162 Okl. 82, 19 P.2d 157 (1933); *Cameron v. Stephenson*, 379 F.2d 953 (10th Cir. 1967). The court found both of these elements to be present in this case and so allowed reformation of the written subordination agreement to conform to the prior oral understanding between the parties.

Acco's contention is that reformation is an inappropriate remedy where a party's unilateral mistake is the result of his or its own negligence. It is undisputed that the written subordination agreement stated that the bank's security interest was subordinated to Acco's security interest in both group 5 and group 6 hogs. The failure of the bank president to read the agreement before signing it was directly related to the mistake. There is no evidence that Acco

used any trick or artifice to induce the president to sign without reading the contract.

■ Failure to read a contract prior to signing does not necessarily bar reformation of the contract under Oklahoma law. *Cameron v. Stephenson, supra; Oklahoma City Federal Savings & Loan Assn. v. Clifton*, 183 Okl. 74, 80 P.2d 283 (1938). *See also Homestake Production Co. v. Trustees of Iowa College*, 331 F.2d 919 (10th Cir. 1964). The Restatement of Contracts § 505 (1932) states that reformation is available when "one party at the time of the execution of a written instrument knows not only that the writing does not accurately express the intention of the other party as to the terms embodied therein, but knows what that intention is, the latter can have the writing reformed so that it will express that intention." Comment b to Section 505 states that the rule is applicable whether the mistake was caused by misrepresentation by the other party or not. Restatement § 508 states that negligent failure to read the contract does not bar relief.

■ This appears to be a well reasoned position. In a case where a party is mistaken as to the contents of a written agreement, some form of negligence is nearly always present. To bar reformation because of negligence would severely limit the application of this remedy. In any event, some form of fraud or inequitable conduct is required in order to reform a contract involving a unilateral mistake. In balancing the fraud or inequitable conduct of one party against the mere negligence of the party seeking reformation, equity should favor the negligent party. However, under some circumstances, failure to read a contract has been held to rise to the level of culpable negligence which indeed does preclude a party from claiming mistake as to the contents of the agreement. *Strouhal v. Allied Development Co.*, 220 F.2d 541 (10th Cir. 1955); *Green v. Cox Machinery Co.*, 116 Okl. 255, 244 P. 414 (1926). Whether the failure to read the written agreement is so culpable or inexcusable as to bar a request for reformation is to be determined on the facts of each case.

■ Mr. Wesner, the bank president, testified that he had faith in the integrity and honesty of Acco and believed that the written agreement conformed to the oral agreement. This was cited as a basis for excusing failure to read a written instrument when reformation was sought in *Newbern v. Gould, supra*. Here the Court found clear evidence that the written subordination agreement did not conform to the actual agreement between the parties. We are mindful that bankers ought to read before signing. But the circumstances of the case show that mutual trust existed. It cannot be said that the bank's failure to read the written contract before signing it was so culpable as to preclude the exercise of the court's equitable powers to reform the contract to give effect to the actual agreement between the parties.

Acco further argues that no inequitable conduct was shown on its part to justify reformation. The bank cites Acco's submission of a written contract which was broader than the oral agreement between the parties and the failure to disclose the preexisting feed debts as evidence of inequitable conduct which justified the reformation holding.

■ Acco further states that a contract is not to be reformed to correct a unilateral mistake unless the inequitable conduct of the other party constituted breach of a special or fiduciary relationship or amounted to actual fraud in obtaining execution of the written agreement. The cases do not support this contention. The execution of a written agreement with knowledge that it fails to represent the agreement of the parties is sufficient inequitable conduct to justify reformation. *See* Restatement of Contracts § 505, *supra*. The trial court found that Acco mailed the written subordination agreement form to the bank with the knowledge that it was broader than the actual agreement between the parties. This is sufficient inequitable conduct to justify reformation.

B. *RIGHT TO STOP PAYMENT OF THE CASHIER'S CHECK*

■ The trial court recognized the general rule that the act of issuing a cashier's

check *binds* the issuing bank to pay the instrument and the bank is not allowed to stop payment on it. *TPO, Inc. v. Federal Deposit Insurance Corp.*, 487 F.2d 131 (3rd Cir. 1973). In the usual case in which a bank customer purchases a cashier's check from the bank made to the order of a third party payee the cashier's check is treated as accepted in advance and it cannot be dishonored by the bank because of an indebtedness to it by one of its customers. *Swiss Credit Bank v. Virginia National Bank, Fairfax*, 538 F.2d 587, 588 (4th Cir. 1976).

Some courts have recognized an exception to this rule, however, where the payee of a cashier's check dealt directly with the bank and engaged in some fraud to obtain issuance of the check from the payor bank. In that situation the payor bank is entitled to stop payment on the check. *TPO, Inc. v. Federal Deposit Insurance Corp., supra; Matter of Johnson*, 552 F.2d 1072 (4th Cir. 1977). Similar holdings can be found where there has been a lack of consideration running from the payee who deals directly with the payor bank. *Wilmington Trust Co. v. Delaware Auto Sales*, 271 A.2d 41 (Del. 1970).

■ The trial court found that Acco made fraudulent misrepresentations concerning the extent of the debt owed Acco by Slatton to induce the bank to issue the cashier's check. Acco is not therefore a holder in due course under 12A O.S. 3–302 because it did not act in good faith. Even if Acco was a holder in due course of the check, the bank is entitled to assert the defense of fraud by Acco because Acco dealt directly with the bank in obtaining the check. 12A O.S. 3–305(2). There is no challenge here to the bank's original right to apply the $29,000 check given it by Slatton against the debt Slatton owed to the bank. Therefore, the propriety of that action need not be addressed and the $29,000 will be treated as properly in the hands of the bank. No rights of third party holders in due course of the check are involved in the dispute. Under these circumstances "the strong considerations of public policy favoring negotiability and reliability of cashier's checks" are not present. *TPO, Inc. v. Federal Deposit Insurance Corp., supra*, 487 F.2d at 135. The bank can therefore assert the defense of fraud against Acco. If fraud was present, the stop order on the cashier's check was justified.

This reasoning is limited to situations in which a payor bank refuses to honor a cashier's check when presented by the payee who is not a holder in due course but rather is a party whose fraud induced the bank to issue the check. Thus, a finding of fraud on the part of the payee which (or who) induced the issuance of the check is necessary. The Oklahoma courts apparently have not addressed the extent of a payor bank's right to stop payment under circumstances such as these, but the above reasoning is not offensive to the general policies of the U.C.C. and would likely be adopted by the Oklahoma court.

■ The remaining question is whether the trial court committed error in finding that Acco committed fraud in obtaining the issuance of the check. Acco was entitled to priority over the bank on proceeds from the sale of group 6 hogs only to the extent Acco had not been satisfied on its feed account for group 6 hogs. Acco represented to the bank that the feed account was unsatisfied to the extent of $36,000 before obtaining the $29,000 cashier's check from the bank. This is evidenced by Acco's written statement that with the receipt of the $29,000 from the bank the balance due Acco on group 6 hog feed would be $5,000. This information was false because Acco had in fact arranged to receive or had already received $41,000 in proceeds from the sale of group 6 hogs and was not entitled to first priority in the total $29,000 proceeds because the total amount would have amounted to more than the group 6 hog feed debt which was owed. If the $41,000 was properly used to pay down that debt, Acco would have had priority in only approximately $5,000 worth of group 6 hog proceeds. The bank was entitled to the rest. Acco's fraudulent representation concerning the amount of the group 6 hog feed debt is

sufficient to justify the bank's stop payment order.[1]

The judgment is affirmed.

---

1. We have considered the Oklahoma Supreme Court opinion in *Anderson, Clayton & Co. v. First American Bank of Erick*, Oklahoma, Nos. 51,246, and 51,465, —— P.2d —— (Okl. May 13, 1980), submitted by appellants as additional authority. The case concerned the continued validity of a security interest in cash proceeds which had been deposited in the debtor's checking account and which were later transferred to the depository bank for payment of a debt owed to the bank. The present case is different. It concerns fraudulent inducement in order to secure issue of a cashier's check. The Oklahoma court also addressed the issue of ambiguity in a subordination agreement for the purpose of determining if parol evidence was admissible. The present case concerned the reformation of a subordination agreement which was concededly not ambiguous. We find the case involves Anderson, Clayton & Co. There the similarity ends. It is not helpful in solving the problem before us.