**FEDERAL DEPOSIT INSURANCE CORPORATION and Deposit Insurance National Bank of Oklahoma City, Oklahoma, Plaintiffs-Appellants,**

v.

**Pauline McKNIGHT, Pauline Oil and Gas Company and Rocket Oil Company, Defendants-Appellees.**

**FEDERAL DEPOSIT INSURANCE CORPORATION and Deposit Insurance National Bank of Oklahoma City, Oklahoma, Plaintiffs-Appellants,**

v.

**ALL SOULS EPISCOPAL CHURCH, Defendant-Appellee.**

Nos. 84–2350, 84–2352.

United States Court of Appeals, Tenth Circuit.

Aug. 2, 1985.

Rehearing Denied Sept. 17, 1985.

Charles V. Wheeler and Sidney G. Dunagan of Gable & Gotwals, Tulsa, Okl., for plaintiffs-appellants.

B.J. Rothbaum, Jr. of Linn & Helms, Oklahoma City, Okl., for defendant-appellee Rocket Oil Co.

Michael Paul Kirschner of Hastie and Kirschner, Oklahoma City, Okl., for defendant-appellee All Souls Episcopal Church.

George W. Dahnke and Merrilyn L. Blackburn of Hastie and Kirschner, Oklahoma City, Okl., on brief for defendants-appellees Pauline McKnight and Pauline Oil and Gas Co.

Before BARRETT, MOORE and TIMBERS,* Circuit Judges.

JOHN P. MOORE, Circuit Judge.

This is an appeal from a judgment denying plaintiffs, Federal Deposit Insurance Corporation (FDIC) and Deposit Insurance National Bank of Oklahoma City (DINB), relief on their claim for restitution of money mistakenly paid on cashier's checks issued by the insolvent Penn Square Bank, N.A. (Penn Square). The district court concluded that even though the plaintiffs established a *prima facie* case for restitution, their recovery was barred by the final payment rule of the Uniform Commercial Code (U.C.C.). We conclude the trial court correctly decided the question of restitution, but in applying the U.C.C. to this case, it overlooked the consequences of Penn Square's insolvency. Since those consequences placed the defendants in the position of creditors of an insolvent national bank, and since the federal law providing for liquidation of a national bank must take precedence over the U.C.C., we reverse.

This action has its genesis in a number of separate transactions negotiated by the defendants immediately prior to the closing of Penn Square. While the district court found there was no evidence that any defendant knew of Penn Square's impending failure when these transactions occurred, the proximity of the events to Penn Square's insolvency is the underlying cause of what followed. On July 1, 1982, two banking days prior to Penn Square's closing, defendant Rocket Oil Company redeemed a certificate of deposit (CD) in the face amount of $1.5 million for $1,480,273.98, taking a Penn Square cashier's check of even amount in place of cash. On the following day, defendants Pauline Oil Company and Pauline McKnight liquidated both matured and unmatured CD's and converted the proceeds to cashier's checks totaling $323,538.46. On the same day, defendant All Souls Episcopal Church redeemed two CD's and other paper and exchanged the proceeds for three cashier's checks in the aggregate of $452,527.25. All of the checks received by defendants were deposited in their own banks for collection.

At 7:00 p.m., Monday, July 5, 1982, before any of the checks were presented for payment, the Comptroller of the Currency of the United States declared Penn Square insolvent under 12 U.S.C. § 191, and appointed FDIC to act as receiver pursuant to 12 U.S.C. § 1821(c). FDIC, in turn, organized DINB as a new bank through which insured parties were to be paid. FDIC transferred to DINB funds with which to accomplish this purpose and to conduct operations.

One of the first tasks performed by FDIC employees was the programming of the bank's computer to reject any items in excess of $100,000 drawn against Penn Square accounts. This was done to avoid payment of any withdrawal in excess of the deposit insurance limits. By oversight, the program was not extended to cover cashier's checks issued by Penn Square. Before this error was discovered on July 7, all of the cashier's checks issued to defendants had been presented by the collecting bank and paid by plaintiffs. Upon discovery of these payments, this action was commenced to recover the difference between the insured amounts and the amounts actually paid.

As the facts were not in dispute, the issues were ultimately resolved on cross-motions for summary judgment. FDIC asserted that upon the date of insolvency, all outstanding and unpaid cashier's checks of Penn Square had been converted to deposits by operation of law.[1] This contention was based upon 12 U.S.C. § 1813(*l*)(4), which states: "The term 'deposit' means ... [an] outstanding ... cashier's check, ... issued in the usual course of business *for any purpose....*" (Emphasis added.)

* Honorable William H. Timbers, United States Circuit Judge for the Second Circuit, sitting by designation.

1. Some defendants contend this issue is raised for the first time on appeal. Clearly, that is not the case.

FDIC further contended that payment of any of the cashier's checks in excess of $100,000, the insured amount of any deposit, was a mistake subject to restitution.

Defendants countered with many contentions, principally that they accepted the Penn Square cashier's checks in good faith and that they were thus holders in due course. Accordingly, they argued they were entitled to application of the "final payment rule," which states that payment of any instrument is final as to a holder in due course. U.C.C. § 3–418; Okla.Stat. tit. 12A, § 3–418 (1971).

■ After consideration of the arguments, the trial court concluded the plaintiffs made a *prima facie* case for restitution. The court, in effect, reasoned that 12 U.S.C. § 1813($l$)(4) governed, that defendants were only entitled to payment of the insured amount, and that payment of sums of money greater than the insured amount constituted unjust enrichment. We concur with this reasoning. Yet, the court went on to conclude that since plaintiffs' claims to restitution were based on negotiable instruments, "special rules" in defense were applicable. The court then proceeded to apply the final payment rule. Holding payment of the cashier's checks constituted final payment, the court barred recovery of restitution. We disagree.

Application of the final payment rule was erroneous for a number of reasons. First, as the trial court recognized in concluding plaintiffs had made a *prima facie* case, the consequence of insolvency and the resultant application of the apposite portion of the Federal Deposit Insurance Act [12 U.S.C. § 1813($l$)(4)] converted the cashier's checks from negotiable instruments to deposits by operation of law. Thus, the "special rules" applicable to negotiable instruments are irrelevant.

■ Second, and of greater importance, when the uncollected cashier's checks were finally presented, the defendants were creditors of an insolvent national bank. As such, their rights and liabilities became fixed by the National Bank Act. When that act provides a remedy, it takes precedence over state law. *Cf. Harmsen v. Smith*, 693 F.2d 932 (9th Cir.1982), *cert. denied*, ── U.S. ──, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). Here, the National Bank Act provides for the liquidation of the debts of an insolvent national bank. Accordingly, payment of the debts of Penn Square following insolvency had to have been made in compliance with the National Bank Act, not the Uniform Commercial Code.

■ Finally, neither the good faith of the defendants nor the source of the funds used to acquire the cashier's checks is of consequence. Despite their good faith and the origin of the funds,[2] the defendants have been cast by law into the role of creditors,[3] and, as such, they must be treated in a circumscribed fashion.

The seminal point is the closing of Penn Square. That event not only triggered the liquidation process, but it also cast in stone the relationship of defendants to the bank. "It is well settled that the rights and liabilities of a bank and the bank's debtors and creditors are fixed at the declaration of the bank's insolvency." *American National Bank v. FDIC*, 710 F.2d 1528, 1540 (11th Cir.1983). *See also* 7 Michie on Banks and Banking, Ch. 15, §§ 236, 247 (perm. ed.

---

**2.** Some defendants have argued because the money used to acquire the cashier's checks came from their deposits, the cashier's checks represented "their" money.

**3.** Despite the effort made by some defendants to otherwise cast their role, this conclusion is inescapable. Even had insolvency not occurred, as holders of unpaid cashier's checks drawn on Penn Square, defendants were still creditors. We have previously made plain a cashier's check is nothing more than a debt of the bank accepted by it upon issuance. *Anderson, Clayton & Co. v. Farmers National Bank of Cordell*, 624 F.2d 105 (10th Cir.1980). Moreover, even though defendants' banks had "paid" the checks, payment did not come from the issuing bank, Penn Square. Hence, the "payment" received by defendants was not final, and the checks were simply in the process of collection when the Penn Square insolvency occurred. *Cf.* U.C.C. § 3–501.

1980 and supp. 1985). It is of equal certainty that the holder of a cashier's check is not entitled to preference over general creditors when the issuing bank fails before payment of the check. 10 Am.Jur.2d *Banks* § 799 (Supp.1983). Hence, when the cashier's checks were presented by the collecting bank, they represented an indebtedness subject to ratable dividends to be paid by the FDIC from the remaining Penn Square assets. 12 U.S.C. § 194.

Notwithstanding, it must also be kept in mind that the FDIC functioned as both receiver and insurer in this liquidating process. For this reason, the provisions of the Federal Deposit Insurance Act and the National Bank Act work, and must be read, conjunctively. Therefore, in its capacity as insurer, FDIC was required to pay each of the debts represented by the cashier's checks as insured deposits in accordance with § 1813($l$)(4) and 12 C.F.R. § 330.11. Payment of any sums in excess of the insured amounts, however, would be contrary to the statutory provisions for liquidation and would create a preference of the defendants over the other creditors of Penn Square. Although defendants have argued that this is an inequitable result, it is nonetheless the harsh reality and consequence of Penn Square's insolvency.

The judgment of the trial court is reversed and the case remanded for entry of judgments in favor of plaintiffs for the difference between the amounts mistakenly paid and the insured amount to which each defendant is entitled.