186 N.J. Super. 52 (1982)
451 A.2d 401
JESUS SANTOS, PLAINTIFF-APPELLANT,
v.
FIRST NATIONAL STATE BANK OF NEW JERSEY, A BANKING CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 30, 1982.
Decided August 26, 1982.
*56 Before Judges BOTTER, ANTELL and FURMAN.
William L. Berg argued the cause for appellant (Joel I. Fern, attorney; William L. Berg, on the brief).
Walter Koprowski, Jr., argued the cause for respondent (Velardo & Koprowski, attorneys; Walter Koprowski, Jr., on the brief).
The opinion of the court was delivered by BOTTER, P.J.A.D.
The general question posed in this case is what relief, if any, can plaintiff obtain against a bank whose cashier's check, issued in 1978 to plaintiff's order, has not been presented for payment and apparently has been lost. Implicated in the case is the holding in National Newark & Essex Bank v. Giordano, 111 N.J. Super. 347, 351 (Law Div. 1970), cited with approval in dictum in Bruno v. Collective Fed'l S. & L. Ass'n, 147 N.J. Super. *57 115, 122 n. 2 (App.Div. 1977), that a bank cannot stop payment on or refuse payment of its cashier's check because it is a draft accepted by the bank when issued and is like cash. Defendant relies on this rule as the basis for its demand for security against loss in the event the check is later presented by someone for payment. The trial judge ordered defendant to replace the check only if plaintiff posts security in the full amount of the check, namely, $15,514.46, the security to be in force for seven years from the date the check was issued. Other relief sought by plaintiff, including interest on this amount while held by the bank, was denied. The trial judge did not decide whether defendant can refuse to pay the check if it is presented. For reasons that are later stated, we modify the judgment to afford plaintiff much of the relief he sought.
The judgment on appeal stems from cross-motions for summary judgment which were considered as if the following facts had been stipulated.[1] On June 17, 1978 plaintiff withdrew all the funds in a savings account which he maintained at defendant's bank amounting to $15,514.46, and, apparently at plaintiff's request, the bank issued its cashier's check for that amount to plaintiff's order. (Defendant's pretrial memorandum states that plaintiff said he was planning to return to Puerto Rico.) Plaintiff told a bank employee that he intended to mail the check to his father in Puerto Rico. Defendant asserts that its employee advised plaintiff against putting a cashier's check in the mail; that plaintiff was told the funds could be transferred to Puerto Rico by cable, but that plaintiff rejected this suggestion and the cashier's check was then issued. Plaintiff mailed the check to his father in Coamo, Puerto Rico. Eleven days later, on June 28, 1978, plaintiff advised the bank that the check had been lost in the mail and he asked for a substitute check. The bank demanded an indemnification bond or other security, N.J.S.A. 12A:3-804, and see N.J.S.A. 12A:3-603, but plaintiff could not *58 get a bond since he was unemployed and had no other assets. The bank also tried to assist plaintiff in obtaining a bond but was unsuccessful. The check has never been presented for payment.
The record does not establish whether plaintiff indorsed the check before putting it in the mail or, if indorsed, how it was indorsed. Plaintiff's attorney asserted at oral argument below that plaintiff would deny that he had indorsed the check. However, the trial judge inferred that he probably indorsed the check so that it would be of some use to his father when it arrived in Puerto Rico.[2]
Plaintiff started this action in February 1980. The relief sought in the trial court was a judgment compelling the bank to issue a duplicate check or credit his account with $15,514.46, without security. Alternatively, the complaint sought to compel defendant to establish an interest-bearing account in trust for plaintiff, paying him interest periodically, with the principal to be turned over to plaintiff after six years from the date the check was issued or on another date fixed by the court. In addition, plaintiff sought interest from the date the check was issued, contending that the bank has been unjustly enriched by the use of plaintiff's money since that time.
The judgment that was entered was termed a final judgment in favor of defendant, although not resolving all issues in the case that will be dealt with hereafter. As stated above, defendant was ordered to issue a substitute check when plaintiff posted the security, despite the knowledge that plaintiff had not *59 been able to satisfy this condition. The judgment provided that the security bond would remain in effect until June 17, 1985, seven years from the date of the check. The judgment also provided that plaintiff could move for a modification "if plaintiff discovers evidence as to the existence or non-existence" of the check in the future. All other relief sought by plaintiff was denied. Left unresolved was plaintiff's claim that the money be paid to him at some future time after the statute of limitations has run, although the judgment may be read to imply plaintiff's right to claim the money by reopening the judgment after seven years if he has not posted security before then and the check is still missing.[3]
On appeal plaintiff acknowledges language in our cases to the effect that a bank cannot stop payment on a cashier's check that it has issued. National Newark & Essex Bank v. Giordano, supra. He argues, nevertheless, that payment may be "stopped" in certain circumstances, citing TPO Inc. v. Federal Deposit Ins. Corp., 487 F.2d 131 (3 Cir.1973) (see n. 5, infra). In the case at hand he contends that so much time has passed without the check having been presented for payment that no one coming forward with the check at this late date could possibly be a holder in due course. A holder in due course must take the instrument "without notice that it is overdue ... or of any *60 defense against or claim to it on the part of any person." N.J.S.A. 12A:3-302(1)(c). N.J.S.A. 12A:3-304(3) provides that a purchaser has notice that an instrument is overdue "if he has reason to know ... (c) that he is taking a demand instrument ... more than a reasonable length of time after its issue." The same section presumes that a reasonable time for taking a check drawn and payable in the United States and its territories is 30 days from the time it is issued. Thus, ignoring that someone may have taken the check in timely fashion in 1978 and not yet presented it for payment, plaintiff argues that anyone who presents the check now could not have taken it without notice of its staleness and could not be a holder in due course. Therefore he asks the court to determine the date when the bank would no longer be liable on the check to a holder who may present it for payment.
Unique characteristics have been attributed to cashier's checks. However, the Uniform Commercial Code (hereafter referred to as the UCC or the Code, adopted in New Jersey as N.J.S.A. 12A:1-101 et seq.) does not even mention cashier's checks in Article 3 which governs negotiable instruments.[4] This has created some uncertainty about the right of a bank to stop or refuse payment and to assert defenses of its own or those of its customer against payment of such checks.[5] Professor Lawrence, *61 in "Making Cashier's Checks and Other Bank Checks Cost-Effective: A Plea for Revision of Articles 3 and 4 of the Uniform Commercial Code," 64 Minn.L.Rev. 275, 285-286 (1980), has described the problem as follows:
Although the common belief is that cashier's checks are cash equivalents, the provisions of the Uniform Commercial Code give no indication of how cashier's checks are to be treated. The Code's failure to set forth the rights and liabilities of the parties to a cashier's check has created a good deal of confusion. Moreover, the concern voiced by those courts that seek to ensure the cash-like quality of cashier's checks is at odds with the assumption that these checks should be governed by existing provisions of the Code.
The problem of allocating the risks of litigation and of lost funds has been especially vexing when either the bank or purchaser has a defense arising from the purchase of a cashier's check or from its subsequent negotiation. Courts and commentators have divided sharply over which parties most deserve protection. Two general approaches to the problem have developed. The first looks upon cashier's checks as ordinary negotiable instruments, and treats them as such under the Code. The second approach looks upon cashier's checks as cash equivalents, and ignores the Code provisions that allow obligors on ordinary negotiable instruments to escape liability under certain conditions. [Footnotes omitted][6]
*62 It is not that courts have ignored the Code in determining a bank's obligation to pay a cashier's check.[7] Rather, in viewing these checks as cash equivalents, courts tend to focus on those sections of the Code that seem to make obligations on these instruments final and not subject to countermand. The common perception of cashier's checks as something like cash,[8] having at the least the credit of a bank behind them, derives from principles of law that prevent banks from countermanding such checks in certain situations. For example, the holding in Giordano, supra, can be sustained on the ground that Giordano's *63 defense against the holder could not be interposed as a bar to the bank's obligation to pay the check because it was merely a personal defense based upon the holder's breach of warranty in the sale of trucks. Like other negotiable instruments, payment of a cashier's check held by a holder in due course cannot be defeated by "personal" defenses. See N.J.S.A. 12A:3-305, N.J. Study Comment 1. But it is a mistake to conclude that cashier's checks are like cash in all situations. Rather, their cash-like nature depends on the extent to which various Code provisions bar the interposition of defenses to payment, including defenses of third parties. See N.J.S.A. 12A:3-306(d) and N.J.S.A. 12A:3-603(1); cf. N.J.S.A. 12A:3-804.
Section 3-804[9] applies to lost or stolen instruments and allows recovery by the owner from any party who is liable, subject to posting such security as may be ordered in the court's discretion to assure indemnification of an obligor against loss by reason of further claims on the instrument. However, the right to recover on a lost or stolen check, giving security to the drawer, does not advance us very far in determining the issues in this case. The first issue we must decide is whether any relief can be given to plaintiff without his posting security. Section 3-804's recognition of an owner's right to recover on a lost or stolen instrument does not determine the bank's exposure to double liability *64 should a holder thereafter present the instrument for payment. The right of a holder to recover is governed by other sections of the Code. The basic question is whether anyone other than plaintiff who presents the check now, four years after its issuance, can recover from defendant, or, conversely, can plaintiff or defendant defeat such recovery.
A check is a draft or order on a bank to pay on demand[10] and a cashier's check is a draft drawn by a bank upon itself. See N.J.S.A. 12A:3-104(2)(a) and (b).[11] Acceptance is the drawee's signed engagement to honor the draft as presented; it must be written on the draft. N.J.S.A. 12A:3-410. Thus, the nature of a cashier's check is such that many courts have said it is a draft which is accepted at the time of issuance,[12] the signature of the bank officer drawing the check being taken as the acceptance.
The maker of a note and the acceptor of a draft appear to have equal obligations by virtue of N.J.S.A. 12A:3-413. They are primarily liable on the instrument. Each "engages to pay the instrument according to its tenor" when engaged or as completed. Id. Section 3-418 makes "payment or acceptance ... final in favor of a holder in due course, or a person who has in good faith changed his position in reliance on the payment." But it is a mistake to say that because acceptance is final in favor of a holder in due course cashier's checks, when viewed as *65 accepted drafts, cannot be countermanded.[13] The purpose of § 3-418 seems unrelated to cashier's checks. Its purpose is to bind a drawee who pays or accepts an instrument on which the drawer's signature is forged[14] or when the drawer's account is insufficient to cover the draft.[15] The reason for this is that the drawee should know the drawer's signature and the status of his account.[16] From this perspective § 3-418 seems addressed to drafts drawn and presented for acceptance by someone other than the drawer himself, not to cashier's checks. Moreover, § 3-418 provides that payment or acceptance is not final where the holder has breached his warranty on presentment imputed by N.J.S.A. 12A:3-417, namely, that "(a) he has good title to the instrument or is authorized to obtain ... acceptance on behalf of one who has good title." Thus, acceptance and payment are not final as to all holders in all circumstances.[17] There is no reason, therefore, to take § 3-418 as a signal that payment on a *66 cashier's check cannot be stopped or refused because it is an accepted draft and acceptance is "final" as to a holder in due course. Defenses can be asserted that do not involve a repudiation of obligations assumed by the act of acceptance. As stated by Fox, supra, n. 6, 19 B.C.L.Rev. at 690, n. 55, "The act of acceptance ... does not forever preclude the acceptor from any possible defense on the instrument."
Some decisions that have termed a cashier's check a draft which is accepted upon issuance, and therefore like cash, say that a remitter's stop payment order comes too late to arrest payment because acceptance has preceded receipt of the stop order. Giordano case, supra, 111 N.J. Super. at 351, relying on N.J.S.A. 12A:4-303(1)(a). Giordano recognizes, however, that it is inappropriate to talk of a customer's or remitter's stop payment rights in relation to cashier's checks. N.J.S.A. 12A:4-403 gives a customer the right to order his bank to stop payment only on an "item payable for his account." He cannot order the bank to dishonor a cashier's check since it is not payable from his own account within the meaning of § 4-403. Giordano, supra, 111 N.J. Super. at 352; Dziurak v. Chase Manhattan Bank, N.A., supra, n. 5, 44 N.Y.2d at 777, 406 N.Y.S.2d at 31, 377 N.E.2d at 475. Funds from a customer's account are usually transferred to the bank upon issuance of the check. The bank check is drawn upon the bank's own assets. If the bank is viewed as the acceptor of a cashier's check, the check constitutes the bank's own engagement to pay the instrument. Sections 3-410 and 3-413. Therefore, it is immaterial that N.J.S.A. 12A:4-303(1)(a) provides that a stop order is ineffective if it is not given in sufficient time for the bank to act upon it before accepting an item. The remitter or customer has no right to order payment stopped at any time. He can ask the bank to refuse payment, and the bank may do so as a favor. See UCC Comment 3 under § 3-603: "If the paying party chooses to refuse payment and stand suit, even though not indemnified or *67 enjoined, he is free to do so...."[18] However, the efficacy of legal rules would be impaired if banks can repudiate their obligations on cashier's checks simply because they will suffer no significant penalty as a result. See N.J.S.A. 12A:4-402.[19]
Another reason given for denying the bank's right to refuse payment on a cashier's check is that, by virtue of N.J.S.A. 12A:3-802(1)(a), unless otherwise agreed, taking an instrument in payment of an obligation where a bank is the drawer, maker or acceptor of the instrument, discharges the underlying obligation pro tanto if there is no recourse on the instrument against the underlying obligor.[20] An example is a cashier's check issued to the order of one who sells goods to the remitter of the check. If the seller of goods is the payee of the check, he has no *68 recourse against the remitter absent the remitter's indorsement or separate agreement to that effect. See Lawrence, supra, 64 Minn.L.Rev. at 303; cf. Times Square Auto Co. v. Rutherford Nat'l Bank, 77 N.J.L. 649, 650-651 (E. & A. 1909) (a check certified at the holder's request was the same "as if Purdy [the car buyer] had paid cash"). When the underlying obligation of the remitter is discharged it may be unfair to allow the bank to interpose its own defenses to payment, or those of the remitter, such as failure of consideration. But if a remitter who has persuaded the bank to dishonor its cashier's check is estopped on equitable principles, see § 1-103, supra, n. 7, from claiming that his underlying obligation has been discharged, § 3-802 would be no obstacle to the bank's assertion of defenses to payment. Cf. Condenser Service and Eng'r Co., Inc. v. Mycalex Corp. of America, 7 N.J. Super. 427, 430 (Law Div. 1950) (applying New York law). Thus, the extent to which a bank is unable to assert defenses determines the cash-like nature of cashier's checks.[21]
We have demonstrated that characterizing cashier's checks as drafts accepted upon issuance is not dispositive of the issue at hand. Viewing cashier's checks as notes, as suggested by *69 § 3-118(a), is also not dispositive. N.J.S.A. 3-118(a) expressly provides, in part: "A draft drawn on the drawer is effective as a note." By the terms of § 3-118, this rule applies "to every instrument." It is designed to deal with ambiguous instruments that may be taken to be drafts or notes. Since cashier's checks are drafts drawn on the drawer they literally fit this rule, and some courts have regarded them as notes. TPO v. Federal Deposit Ins. Corp., supra, 487 F.2d at 135-136; Banco Ganadero y Agricola, S.A. v. Society Nat'l Bank of Cleveland, 418 F. Supp. 520, 523-524 (N.D.Ohio 1976); Laurel Bank and Trust Co. v. City Nat'l Bank of Conn., 33 Conn. Supp. 641, 643, 365 A.2d 1222, 1224 (Super.Ct. 1976); State Bank of Brooten v. American Nat'l Bank of Little Falls, 266 N.W.2d 496, 498 (Minn.Sup.Ct. 1978). Benson, supra, n. 6, 2 Ohio N.L.Rev. at 449, states that § 3-118(a) has removed the option holders had under the Negotiable Instruments Law to treat a draft drawn on the drawer, i.e., a cashier's check, as either a draft or a promissory note. Calling cashier's check notes makes stop payment references inappropriate and tends to diminish their cash-like nature. See the TPO case, supra, 487 F.2d at 135-136. Viewed as notes, cashier's checks would be subject to the ordinary defenses of banks under §§ 3-305 and 3-306 applicable to holders according to their "due course" status. Benson, supra, n. 6, 2 Ohio N.L.Rev. at 449; Lawrence, supra, 64 Minn.L.Rev. at 288.[22]
*70 Whether cashier's checks are viewed as accepted drafts or as notes, on the facts of this case §§ 3-306[23] and 3-603(1)[24] would allow plaintiff or defendant to assert claims or defenses against someone who presents the cashier's check for payment based on the allegation that the check has been lost. The Code's ambiguities give us concern, as well as the realization that, because cashier's checks are perceived by the public as cash-like, the Code should be interpreted to limit the defenses that can be raised. See Lawrence, supra, 64 Minn.L.Rev. at 311. Nevertheless, holders in due course will be protected against personal or *71 ordinary contract defenses of the remitter, see note 21, supra, although an unexpected burden of commencing litigation may be shifted to other holders.[25]
Sections 3-306(d) and 3-603(1) largely determine what defenses can be asserted in an action against the bank and affect the procedure governing the assertion of defenses. Section 3-603(1) generally discharges a bank from further liability on payment to a holder except in cases of theft of the instrument or violation of a restrictive indorsement,[26] unless the person asserting an adverse claim supplies adequate indemnity or enjoins payment by court order in an action in which the claimant and the holder are parties. Section 3-306 provides generally that one not a holder in due course takes an instrument subject to: (a) "all valid claims to it" by any person, (b) "all defenses of any party" that would be available in a contract action, (c) the defense of failure of consideration and (d) theft or violation of a restrictive indorsement. Subsection (d) tracks § 3-603(1) by further providing that "[t]he claim of any third person to the instrument is not otherwise available as a defense to any party liable thereon unless the third person himself defends the action for such party." See note 21, supra, as to the availability of "third party" defenses.
*72 We will now apply the Code to the facts at hand. The first and simplest conclusion is reached on the assumption that plaintiff, the payee of the cashier's check, did not indorse the check before mailing it to Puerto Rico and did not authorize its indorsement by his father or anyone else. See note 2, supra. Without an indorsement of the check no one can be a holder, much less a holder in due course. See N.J.Study Comment 1 to N.J.S.A. 12A:3-202; Rosenthal, supra, n. 8, 71 Colum.L.Rev. at 379. N.J.S.A. 12A:1-201(20) defines a holder as one in possession of an instrument "drawn, issued or indorsed to him or to his order or to bearer or in blank." See, also, N.J.S.A. 12A:3-202(1), which provides that negotiation is the transfer of an instrument in such form that the transferee becomes a holder. If payable to order, negotiation is made by delivery with any necessary indorsement; bearer paper is negotiated by delivery alone. Id.
Lacking plaintiff's indorsement personally or by someone else with authority, note 2, supra, a person attempting to negotiate the check may forge plaintiff's signature. But a forged indorsement is wholly inoperative, and the possessor has no right to enforce payment by any party to the check. N.J.S.A. 12A:3-404(1) (an unauthorized signature is wholly inoperative unless ratified or unless the person whose name is signed is precluded from denying it); N.J.S.A. 12A:3-419(1)(c) (an instrument is converted when paid on a forged indorsement); Gast v. American Cas. Co. of Reading, Pa., 99 N.J. Super. 538 (App.Div. 1968); Salsman v. National Community Bank of Rutherford, supra, n. 7, 102 N.J. Super. at 489, 492, see Stone & Webster Eng'r Corp. v. First Nat'l Bank & Trust Co., 345 Mass. 1, 184 N.E.2d 358 (Sup.Jud.Ct. 1962). Defendant would be liable to plaintiff if it pays the check without plaintiff's indorsement or on a forged indorsement.
However, if the check was indorsed by plaintiff in blank, it became bearer paper. See N.J.S.A. 12A:1-201(20); N.J.S.A. 12A:3-202(1). One who finds or steals bearer paper cannot be a holder in due course. A holder in due course is defined by N.J.S.A. 12A:3-302 as one who (1) takes a negotiable *73 instrument (a) for value, (b) in good faith and (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person. But a thief can negotiate bearer paper by delivery to a holder in due course who will be protected against the rightful owner. N.J.S.A. 12A:3-207, UCC Comment 2.[27] A holder in due course takes the instrument free from all claims to it on the part of any person, N.J.S.A. 3-305(1), "even though the prior negotiation may have been ... illegal in its essence and entirely void." UCC Comment 5 to N.J.S.A. 12A:3-207. See, also, N.J.S.A. 12A:3-603(1)(a) which denies discharge of liability to a party who in bad faith paid an instrument held by a thief or one who took through a thief, except a holder in due course.
In this case no one could be a holder in due course unless the check had been indorsed by plaintiff or by someone with authority from plaintiff, possibly plaintiff's father. A holder who acquired the check from someone who found it or stole it after it was properly indorsed would be protected, providing he acquired it for value, in good faith and without notice that it was overdue or of defenses or claims upon it by any person. N.J.S.A. 12A:3-302(1)(c). As noted earlier, one is deemed to have notice that a demand instrument is overdue if he takes it "more than a reasonable length of time after its issue," N.J.S.A. 12A:3-304(3)(c). "A reasonable time for a check drawn and payable within the states and territories ... is presumed to be thirty days." Id.[28]N.J.S.A. 12A:3-102(1)(a) provides that "issue" *74 means "the first delivery of an instrument to a holder or a remitter." That was the day plaintiff received the check, June 17, 1978.
Checks are demand instruments that are normally "collected as quickly as possible." Rosenthal, supra, n. 8, 71 Colum.L.Rev. 381, n. 29. One would expect cashier's checks to be treated no differently, and that they will be negotiated with alacrity. One would have to be suspicious of any holder who presented this cashier's check for $15,514.46 more than four years late yet claimed he had taken it in timely fashion after it was issued. Would such a holder be prevented from demanding payment at this time?
Timely presentment for payment is necessary to charge parties who are secondarily liable on an instrument. N.J.S.A. 12A:3-501; see, also, N.J.S.A. 12A:3-413, N.J.Study Comment 1. However, presentment is not required to charge parties primarily liable, such as the maker of a note, acceptor of a draft, or a bank that certifies a check. Id.; N.J.Study Comment 1 to N.J.S.A. 12A:3-122; 3 Anderson, Uniform Commercial Code (2 ed. 1971), § 3-501:6 at 8. Construing drafts drawn on the drawer as notes, N.J.S.A. 12A:3-118(a) eliminates the need for presentment, as our previous discussion of this section demonstrates. See n. 22, supra.
N.J.S.A. 12A:4-404 provides that "[a] bank is under no obligation to a customer having a checking account to pay a check, other than a certified check, which is presented more than six months after its date...." (Emphasis supplied) Certified checks are excluded from this section because certification is acceptance that makes them the primary obligation of the certifying bank. N.J.S.A. 12A:3-411. As the N.J.Study Comment states: "Under section 4-404, a bank would be obliged to pay a certified check if it was presented within the period of *75 limitations." This is consistent with our conclusion that a cashier's check need not be presented promptly for payment but may be presented at any time during the six year statute of limitations, N.J.S.A. 2A:14-1, subject to defenses against payment that may be asserted.[29] We must now consider when the statute begins to run.
A cause of action against a maker or an acceptor of a demand instrument accrues on the date of the instrument or, if no date is stated, on the date of issue. N.J.S.A. 12A:3-122(1)(b); Ligran, Inc. v. Medlawtel, Inc., 86 N.J. 583, 588 (1981). See First Nat'l Bank in Albuquerque v. Allison, 85 N.Mex. 511, 514 P.2d 30 (Sup.Ct. 1973), rev'g 85 N.Mex. 283, 511 P.2d 769 (Ct.App. 1973), holding that the six-year statute of limitations on a cashier's check begins to run on the date of issue. See, also, Note, "Negotiable Instruments  A Cause of Action on a Cashier's Check Accrues from the Date of Issuance," 4 N.Mex.L.Rev. 253 (1974). Except for certificates of deposit, § 3-122 continues the rule that the statute of limitations begins to run against primary parties on demand instruments "at the moment of issue, for it is clear that no demand for payment is needed" to charge such parties. N.J.Study Comment 1, N.J.S.A. 12A:3-122.
Thus, a person taking plaintiff's cashier's check in timely fashion, who presents it for payment at any time within six years after its issuance, will be entitled to payment from the bank if he meets holder-in-due-course requirements. Although it is possible, it is highly improbable that the check in this case will reappear at this late date, much less in the hands of one *76 who qualifies as a holder in due course. Nevertheless, to require payment now without security for indemnification would expose defendant to a risk of loss through no fault of its own. See UCC Comment to § 3-804:
If the claimant testifies falsely, or if the instrument subsequently turns up in the hands of a holder in due course, the obligor may be subjected to double liability. The court is therefore authorized to require security indemnifying the obligor against loss by reason of such possibilities. There may be cases in which so much time has elapsed, or there is so little possible doubt as to the destruction of the instrument and its ownership that there is no good reason to require the security. The requirement is therefore not an absolute one, and the matter is left to the discretion of the court.
We cannot say that so much time has elapsed to obviate the need for security. Earlier we noted that similar authority to enforce lost, stolen or destroyed instruments had been exercised by chancery courts. Note 9, supra. In Sterne v. South Jersey Title and Finance Co., 91 N.J. Eq. 363 (Ch. 1920), the court granted relief without a surety on the indemnification bond because of convincing proof that the check bore a restrictive indorsement, was lost in the mail, and had not been presented for payment within a reasonable time after issue. The claimant was also financially responsible. However, the court held that the bank was justified in demanding security before suit when the proofs were not known. The court considered that proving various defenses may be difficult. Proving the date on which an instrument was taken may be difficult because the time of indorsement usually does not appear on the instrument, and such proof may depend on "the uncertainty and fallibility of ... human testimony." Id. at 365.
We need not speculate about all possible issues that might arise if the cashier's check were to reappear now in the hands of someone demanding payment. Forgery of an indorsement or authority to make an indorsement on plaintiff's behalf might be issues, as well as ratification by plaintiff. Suffice it to say that even if plaintiff testified that he did not personally sign the instrument, the bank should not be put to the risk that a holder may assert that plaintiff authorized someone else to make the *77 indorsement. But because so much time has passed some remedy ought to be available at this time.[30]
Before fashioning the remedy we need to consider a procedural issue. Since plaintiff asserts a claim to the instrument because he did not indorse it, defendant may be unwilling to pay the instrument although not enjoined by a court from doing so. Discharge of the bank's liability under § 3-603 requires payment or satisfaction of a holder, and without the payee's indorsement no one can be a holder, as stated previously. However, defendant is allowed to pay a holder and be discharged despite the assertion of other claims by plaintiff unless plaintiff obtains an injunction barring payment in an action in which the court has jurisdiction over both the holder and plaintiff. N.J.S.A. 12A:3-603(1). But an unknown holder cannot be made a party to this action. Nevertheless, in the circumstances of this case, if the check is hereafter presented for payment, we direct defendant to withhold payment for a reasonable time to allow defendant as well as plaintiff to investigate the claimed negotiation to the holder and to take appropriate action in the event either party wishes to contest the claim. This relief is granted despite the provisions of § 3-603(1) by invoking principles of equity to supplement the Code. N.J.S.A. 12A:1-103, discussed in n. 7, supra. However, the relief which we afford is granted on the assumption that on remand to the trial court plaintiff will furnish his affidavit and that of his father, if available, as well as of other persons having knowledge relevant to the disappearance of the check, to support plaintiff's claim. As *78 stated above, n. 1, no affidavits were submitted for plaintiff on the motions for summary judgment, but they are essential for relief to be granted with some certainty in a case of this kind.
Plaintiff is entitled to substantive relief. If the check is not presented for payment by June 18, 1984 and if no other action concerning the check has been commenced before then, the statute of limitations will have run and plaintiff will be entitled to the principal amount of the check. In the meantime, because the reappearance of the check seems unlikely, we will order the bank to issue at this time a certificate of deposit in plaintiff's name for $15,514.46 bearing the highest prevailing interest rate for such an instrument. The certificate shall be held by defendant as security for its obligation on the cashier's check so long as that obligation remains open, subject to the following provisions and the further order of the court. The interest shall be paid to plaintiff quarterly until the check is presented or an action against the bank is commenced by a holder of the check, or until July 1, 1984, whichever first occurs. If the check is not presented and no such action is commenced by July 1, 1984, and no contrary order is entered, the principal and all accrued interest shall be paid to plaintiff at that time.
We will also deal with plaintiff's claim to interest on the face amount of the check from June 17, 1978 until our judgment is effectuated by the issuance of a certificate of deposit. No evidence was presented to the trial court on this issue and the trial judge did not deal with it. Defendant's pretrial memorandum states that the funds represented by the check "remain on deposit in the cashier check account of the defendant." The bank officer's affidavit supporting its motion for summary judgment does not deny that the bank has had the use of plaintiff's money since the issuance of the check. See Editorial, 109 N.J.L.J. 308, supra, n. 6, referring to the "float" enjoyed on bank checks between their issuance and clearance.
N.J.S.A. 12A:3-122(4), as amended, provides:
Unless an instrument provides otherwise, interest runs at the rate provided by law for a judgment

*79 (a) in the case of a maker, acceptor or other primary obligor of a demand instrument, from the date of demand;
(b) in all other cases from the date of accrual of the cause of action.
Thus, under subsection (4)(a), a bank is obligated to pay interest on a cashier's check from the date of the demand for payment if payment is not made in the usual course.[31] Normally, interest is not paid on checks collected in timely fashion.[32] But interest would begin to run against the primary obligor of a demand instrument from the date of a demand which has been improperly refused. Payment of "conventional or contractual" interest on instruments for the payment of money represents the "compensation fixed by the parties for the use, detention or forbearance of money" and is "recoverable as of right along with the principal." Deerhurst Estates v. Meadow Homes, Inc., 64 N.J. Super. 134, 154 (App.Div. 1960), certif. den. 34 N.J. 66 (1961). Interest "allowable as damages" on liquidated claims is different from such "conventional or contractual" interest. Id. Prejudgment interest on liquidated damage claims is allowed in accordance with principles of equity. Bak-A-Lum Corp. v. Alcoa Building Products, Inc., 69 N.J. 123, 131 (1976).
Plaintiff's claim in this case was not on the instrument, since he was not a holder of it, but was a claim for payment without presenting the instrument. It is simply a claim for liquidated damages. As such, prejudgment interest is not due *80 as of right but may be allowed on equitable principles. In determining whether interest should be granted to plaintiff consideration should be given to the period of time during which defendant would have had the use of the money before the check would have been paid in the normal course of events. Consideration should also be given to the time elapsing from the date of the check until it became stale and was not likely to be presented by a credible holder. The remedy we have afforded here of giving plaintiff a certificate of deposit bearing interest with the certificate pledged to the bank as security pending the running of the statute of limitations is novel. However, it is fairly embraced by the demand for judgment in the complaint filed in February 1980, namely, that the bank establish an interest-bearing account in trust for plaintiff until the principal will be paid to him six years from the date of issue. Under N.J.S.A. 12A:3-122(4) defendant will not be obligated to pay interest on the check to any holder from June 17, 1978 until the holder makes demand for payment. Thus, there is no risk of double liability for interest during this period. It must have been obvious long ago that this check was not likely to be presented for payment. Unfortunately for plaintiff, he did not have the use of his own money during the unusual period when the bank's obligation to pay on this check was suspended. The equities clearly favor awarding plaintiff prejudgment interest. However, we will not determine the rate of interest or its starting date, since the parties should first be given an opportunity to be heard on the issue. Cf. R. 4:42-11 providing for interest on judgments at 12% and prejudgment interest at 12% in certain tort actions beginning six months after the cause of action arose. Cf., also, the offer of judgment rule, R. 4:58-1.[33]
Accordingly, the case is remanded to the trial court for disposition of the unresolved aspects of prejudgment interest. *81 A portion of the prejudgment interest that is awarded shall be added to the principal of the certificate of deposit to be held as security as previously ordered. This amount shall be determined by the trial judge and will serve as security for reimbursement to the bank for any legal expenses it incurs in the future should an action be commenced by a holder of the check. We note that the burden of defense in that action should be borne by plaintiff as provided in N.J.S.A. 12A:3-306(d), quoted in n. 23, supra. Any remaining portion of prejudgment interest shall be paid to plaintiff promptly after the proceedings on remand are concluded.
The judgment below is amended as provided herein and the case is remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] Plaintiff's motion was not supported by any affidavits; however, most of the material facts are not in dispute.
[2] Without impugning the validity of the inference drawn by the trial judge, it may be noted that a payee can authorize someone else to indorse the instrument by signing his name. N.J.S.A. 12A:3-202(2); N.J.S.A. 12A:3-403; see Bruno v. Collective Fed'l S. & L. Ass'n, supra, 147 N.J. Super. at 120. Note, also, N.J.S.A. 12A:4-205(1), which provides that unless an instrument states that the payee's indorsement is required, a statement that it was deposited by a customer or credited to his account is effective as the customer's indorsement if such statement is placed on the instrument by a depositary bank which has taken it for collection.
[3] At the hearing on the motions the trial judge correctly stated that the "statute of limitations normally is six years." However, he made no binding ruling to that effect. Plaintiff objected to the entry of a final judgment in a form that did not determine when the statute of limitations would run and did not provide for the disposition of the funds in the event plaintiff is unable to post a bond. Plaintiff argued that the proposed form of judgment would allow the bank to keep the money forever if no bond were posted. The provision for modifying the judgment appears to have been added in response to these objections, possibly with the view that after seven years the check could be adjudicated lost with certainty. Cf. N.J.S.A. 3A:40-1, which provides that persons missing continuously for five years (formerly, seven years, as at common law) are presumed dead. At oral argument before us the bank's attorney took the position that the six-year statute of limitations probably applies and plaintiff can come back after six years and ask for payment.
[4] The term "cashier's check" appears only in § 4-211 of the Code, N.J.S.A. 12A:4-211. This is part of Article 4 which deals with banks deposits and collections.
[5] See, e.g., TPO Inc. v. Federal Deposit Ins. Corp., supra, 487 F.2d at 136, holding that a cashier's check is equivalent to a negotiable promissory note in a case where the check was given in payment for securities purchased by the bank from plaintiff; Travi Constr. Corp. v. First Bristol County Nat'l Bank, 10 Mass. App. 32, 405 N.E.2d 666 (1980), holding that a bank can dishonor its cashier's check when presented by a holder with whom it has dealt for failure of consideration given by the holder for the check; State ex rel. Chan Siew Lai v. Powell, 536 S.W.2d 14, 16 (Mo.Sup.Ct. 1976), holding that a cashier's check is a draft accepted by the issuing bank by the mere act of issuance, which cannot be countermanded by the bank's customer who asserted that the payee obtained the check through fraud; Thompson Poultry, Inc. v. First Nat'l Bank of York, 199 Neb. 8, 9, 255 N.W.2d 856, 858 (1977), holding that a bank money order, like a cashier's check, was a bank draft accepted by the bank upon issuance and was also "equivalent to a negotiable promissory note of the bank," in a case in which the bank refused to honor the instrument because of its customer's defenses which, nevertheless, the court considered and rejected also; Dziurak v. Chase Manhattan Bank, N.A., 44 N.Y.2d 776, 406 N.Y.S.2d 30, 377 N.E.2d 474 (1978), aff'g 58 App.Div.2d 103, 396 N.Y.S.2d 414 (1977), rev'g 88 Misc.2d 641, 388 N.Y.S.2d 496 (Sup.Ct. 1976), upholding the bank's refusal to honor plaintiff's request not to pay a cashier's check upon plaintiff's assertion that he was fraudulently induced to indorse the check to its holder; Wertz v. Richardson Heights Bank and Trust, 495 S.W.2d 572, 574 (Tex.Sup.Ct. 1973), holding that a bank could not dishonor a cashier's check delivered to one described as a holder in due course because the check is a draft accepted in advance by the act of issuance and is "not subject to countermand by either its purchaser or the issuing bank."
[6] See, also, Benson, "Stop Payment of Cashier's Checks and Bank Drafts under the Uniform Commercial Code," 2 Ohio N.L.Rev. 445 (1975); Fox, "Stopping Payment on a Cashier's Check," 19 B.C.L.Rev. 683 (1978); Wallach, "Negotiable Instruments: The Bank Customer's Ability to Prevent Payment on Various Forms of Checks," 11 Ind.L.Rev. 579 (1978); Comment, "The Rights of a Remitter of a Negotiable Instrument," 8 B.C. Indus. & Com.L.Rev. 260 (1967); Note, "Blocking Payment on a Certified, Cashier's, or Bank Check," 73 Mich.L.Rev. 424 (1974); Note, "Adverse Claims and the Consumer: Is Stop Payment Protection Available?" 67 Nw.U.L.Rev. 915 (1973); "Issuing Trust Checks Against Bank Checks? Is the Risk `Negligible?'" Editorial, 109 N.J.L.J. 308 (1982); cf. Note, "Personal Money Orders and Teller's Checks: Mavericks Under the UCC," 67 Colum.L.Rev. 524 (1967).
[7] The lack of specific reference to cashier's checks, noted above, n. 4, invites the importation of principles of law found outside the Code as authorized by N.J.S.A. 12A:1-103. See TPO case, supra, n. 5. Section 1-103 provides that principles of law and equity shall supplement the Code unless displaced by its "particular provisions." See Kaplan v. Walker, 164 N.J. Super. 130, 135 (App. Div. 1978); Salsman v. National Community Bank of Rutherford, 102 N.J. Super. 482, 492 (Law Div. 1968), aff'd on opinion below, 105 N.J. Super. 164 (App.Div. 1969); Clarkson v. Selected Risks Ins. Co., 170 N.J. Super. 373, 381 (Law Div. 1979).
[8] The "public ... perceives bank checks as the equivalent of cash." Lawrence, supra, 64 Minn.L.Rev. at 281. As early as 1758 Lord Mansfield described bank bearer notes according to prevailing practice as "money or cash," not "documents for debt," saying that "trade and commerce ... would be much incommoded by a contrary determination." This was before Bank of England notes had become legal tender. Rosenthal, "Negotiability  Who Needs It?" 71 Colum.L.Rev. 375, 377, n. 9 (1971). Miller v. Race, 97 Eng.Rep. 398, 401 (K.B. 1758). Similar views were expressed by Judge Sugrue in National Newark and Essex Bank v. Giordano, supra, (hereafter referred to as Giordano), 111 N.J. Super. at 351, in support of his interpretation of Code provisions constituting a "statutory prohibition against stopping payment on a cashier's check." See, also, Kaufman v. Chase Manhattan Bank, N.A., 370 F. Supp. 276, 279 (S.D.N.Y. 1973), quoting Giordano. Nevertheless, N.J.S.A. 12A:3-101 et seq. applies to all negotiable instruments but not to "money, documents of title or investment securities." N.J.S.A. 12A:3-103 (emphasis added). See, also, N.J.S.A. 12A:4-104(1)(g) which defines "item" as any instrument for the payment of money but not including "money." That cashier's checks are not truly "cash equivalents" is evident from this opinion.
[9] See, also, N.J.S.A. 2A:47-1 pertaining to lost or destroyed deeds or other instruments of title to real or personal property.

N.J.S.A. 12A:3-804 is substantially the same as N.J.S.A. 2A:54-1 which it replaced. N.J.Study Comment 1 to N.J.S.A. 12A:3-804. Courts of equity had jurisdiction to grant relief in cases involving the loss or theft of various instruments. Moore v. Durnan, 69 N.J. Eq. 828 (E.&A. 1905); Verdi v. Price, 129 N.J. Eq. 355, 356 (E.&A. 1941). The Chancery Court continued to exercise jurisdiction even after a remedy at law was made available by the statutory progenitor of N.J.S.A. 2A:54-1. Force v. Elizabeth, 27 N.J. Eq. 408 (Ch. 1876). The power to order indemnity against loss was the basis for equitable intervention, Verdi v. Price, supra, and requiring indemnification was the rule in cases where bills of exchange (drafts, N.J.S.A. 12A:3-104(2)(a)) or promissory notes were alleged to have been lost or destroyed. Id.
[10] N.J.S.A. 12A:3-104(2)(a) defines a draft or bill of exchange as a negotiable instrument if in the form required by subsection (1) and "if it is an order." A check is defined as a draft drawn on a bank which is payable on demand. N.J.S.A. 12A:3-104(2)(b). Checks and drafts must also satisfy the requirements contained in N.J.S.A. 12A:3-104(1) which, briefly stated, are a writing (a) signed by the maker or drawer, (b) containing an unconditional promise or order to pay, (c) on demand or at a definite time, (d) to order or to bearer.
[11] Giordano case, supra, 111 N.J. Super. at 350-351; see cases cited in n. 5, supra; Brady, Bank Checks (5 ed. Bailey, 1979), § 20.11 at 20-23.
[12] Giordano case, supra, n. 11; Munson v. American Nat'l Bank and Trust Co. of Chicago, 484 F.2d 620, 623-624 (7 Cir.1973); see cases cited in n. 5, supra; Brady, supra, n. 11.
[13] See Brady, supra, n. 11, § 20.12 at 20-27 to 20-31, saying, "it would seem that courts which hold flatly that payment may not be stopped are in error." At 20-30.

Lawrence, supra, 64 Minn.L.Rev. at 288, n. 45, 301, n. 107, and 325, n. 212, states that, if cashier's checks are accepted drafts, § 3-418 makes the bank's obligation final not only as to a holder in due course but also as to a holder who in good faith has changed his position in reliance upon the acceptance. By "final" he means the bank is foreclosed from raising any defense against such a holder. Id. at 301, n. 107. However, § 3-418 speaks of a good faith change in position "in reliance on the payment." It does not say "in reliance on the payment or acceptance." One could postulate reasons why payment of an instrument and acceptance should have different consequences. Benson, supra, n. 6, also questions the interpretation given to this section. 2 Ohio N.L.Rev. at 452.
As to finality of payment see Maplewood Bank and Trust Co. v. F.I.B., Inc., 142 N.J. Super. 480 (App.Div. 1976); Demos v. Lyons, 151 N.J. Super. 489 (Law Div. 1977).
[14] Incorporating the rule of Price v. Neal, 3 Burr. 1354 (1762); UCC Comment 1 to § 3-418.
[15] UCC Comment 2 to § 3-418.
[16] Notes 14 and 15, supra.
[17] See note 13, supra.
[18] Wallach, supra, n. 6, at 586-587, states that the bank's obligation "is essentially contractual in nature... The bank can, should it choose to, breach its contractual liability and refuse to pay the instrument, as there is nothing in the Code which prevents the bank from doing so. Banks can and occasionally will refuse to pay on an instrument either to promote their own self interests or to accommodate a dissatisfied customer who wants to see payment prevented." See, also, Note, 73 Mich.L.Rev., supra, n. 6 at 426, n. 22; Note, 67 Nw.U.L.Rev., supra, n. 6 at 927; cf. Rosenthal, supra, n. 8, at 388. The Appellate Division in Dziurak v. Chase Manhattan Bank, supra, n. 5, said that, "the Bank, as a practical matter, could quite safely have stopped payment on its cashier's check and, by interpleader, have paid the money into court." 58 App.Div.2d at 106, 396 N.Y.S.2d at 416. As to interpleader, see UCC Comment 5 to § 3-306.
[19] N.J.S.A. 17:9A-225(A), which provided that "No banking institution shall stop payment of any check certified by it," was repealed upon adoption of the Code. Cf. DR 7-102(A)(1) and (2), providing that in representing a client an attorney shall not assert a position merely to harass another nor shall he advance a claim or defense that is unwarranted under existing law except in a good faith effort to change the law.
[20] Moon over the Mountain, Ltd. v. Marine Midland Bank, 87 Misc.2d 918, 386 N.Y.S.2d 974 (Civil Ct. 1976) (cashier's check), citing Malphrus v. Home Savings Bank, 44 Misc.2d 705, 254 N.Y.S.2d 980 (Cty.Ct. 1965) (a teller's check on which payment was stopped). But see Rosenthal, supra, n. 8, 71 Colum.L.Rev. at 388, n. 58, referring to Malphrus as "erroneously holding that tellers' checks could not be stopped...."
[21] The defenses that can be asserted largely depend upon the "due course" status of the holder and the relationship of the holder to the bank in the underlying transaction. The holder may have dealt with the bank, as in the TPO and Travi cases, supra, n. 5, or may have received the check from the bank's customer, who is deemed a third party, as in the Giordano case, supra. Benson, supra, n. 6 at 450. Critical to the assertion of third-party claims are §§ 3-306(d) and 3-603(1), infra, n. 23 and n. 24. See N.J.S.A. 12A:3-306, N.J.Study Comment 4 and UCC Comment 2 and 5; N.J.S.A. 12A:3-603, UCC Comment 3; cf. Sutter v. Security Trust Co., 96 N.J. Eq. 644 (E.&A. 1924); Fulton Nat'l Bank v. Delco Corp., 128 Ga. App. 16, 195 S.E.2d 455 (Ct.App. 1973) (a bank draft or teller's check drawn on another bank). The Code provisions which limit the assertion of third party claims and defenses are not clear. They are generally interpreted to mean that a bank may assert theft or violation of a restrictive indorsement when sued by a holder, but that only the third party can assert claims or real defenses to the instrument but may not assert mere contract defenses to the underlying obligation as a defense to the bank's obligation. See Benson, supra, n. 6 at 450-452; Note, 67 Colum.L. Rev., supra n. 6, at 546-548; 6E (Part 2), Willier & Hart, Bender's Uniform Commercial Code Service, § 4-403, at 2-1193 et seq. (1982).
[22] Lawrence contends that § 3-118(a) was not drafted with the purpose of specifying defenses available to obligors. Id. at 288. He states that, "It is not clear that the draftsmen of the Code ever contemplated the application of [§§ 3-305 and 3-306] to cashier's checks, since these provisions certainly weaken the role of cashier's checks as cash substitutes." Id. at 293. Nevertheless, his conclusion that § 3-118(a) was intended "simply to eliminate the need for a holder of a note or accepted draft to protest or give notice of dishonor to the instrument's maker or acceptor" (emphasis supplied), id. at 288, is not supported by any cited authority. The Code commentary to § 3-118 gives no insight to its intended purposes. Benson, supra, n. 6, at 449. One solution is to treat cashier's checks as notes for some purposes and as other instruments, such as checks, for other purposes. See note 29, infra.
[23] N.J.S.A. 12A:3-306 provides:

Unless he has the rights of a holder in due course any person takes the instrument subject to
(a) all valid claims to it on the part of any person; and
(b) all defenses of any party which would be available in an action on a simple contract; and
(c) the defenses of want or failure of consideration, non-performance of any condition precedent, non-delivery, or delivery for a special purpose (12A:3-408); and
(d) the defense that he or a person through whom he holds the instrument acquired it by theft, or that payment or satisfaction to such holder would be inconsistent with the terms of a restrictive indorsement. The claim of any third person to the instrument is not otherwise available as a defense to any party liable thereon unless the third person himself defends the action for such party.
[24] N.J.S.A. 12A:3-603(1) provides:

(1) The liability of any party is discharged to the extent of his payment or satisfaction to the holder even though it is made with knowledge of a claim of another person to the instrument unless prior to such payment or satisfaction the person making the claim either supplies indemnity deemed adequate by the party seeking the discharge or enjoins payment or satisfaction by order of a court of competent jurisdiction in an action in which the adverse claimant and the holder are parties. This subsection does not, however, result in the discharge of the liability
(a) of a party who in bad faith pays or satisfies a holder who acquired the instrument by theft or who (unless having the rights of a holder in due course) holds through one who so acquired it; or
(b) of a party (other than an intermediary bank or a payor bank which is not a depositary bank) who pays or satisfies the holder of an instrument which has been restrictively indorsed in a manner not consistent with the terms of such restrictive indorsement.
[25] Describing cashier's checks as cash equivalents creates an aura of certainty of payment that is not warranted under the Code. Certainty can be assured only by amending the Code. We note that the Permanent Editorial Board for the Uniform Commercial Code has proposed revisions that will constitute a "New Uniform Payments Code" replacing Article 4 and amending Article 3. Proposals contained in P.E.B. Draft No. 2, as revised, dated May 25, 1982, would by prominent legend on an item to that effect identify an item that is not subject to stop orders or reversal and should be treated as cash. The proposals make exception for items that are lost or unauthorized. The proposals are intended to deal with cashier's checks and other bank instruments. Ample reasons for amending the Code are given by Lawrence, supra, 64 Minn.L.Rev. at 285, 290, 340, and others. See articles in note 6, supra.
[26] A restrictive indorsement is one made "for deposit" or is conditional or otherwise prohibits further transfer. N.J.S.A. 12A:3-205.
[27] This rule is of ancient origin. Miller v. Race, supra, n. 8, upholding the claim of the holder of a bearer bank note which had been stolen from the mail and was taken by the holder in good faith, for value, and without any knowledge of the theft. See, also, Chafee, "Rights in Overdue Paper," 31 Harv.L.Rev. 1104, 1112 (1918) ("a thief has legal title to a negotiable instrument payable to bearer or indorsed in blank").
[28] We need not now decide whether a cashier's check, which is deemed a note under § 3-118(a), remains a check for the purposes of this section. We incline to the view that a cashier's check should be deemed a note for some purposes, but that other provisions of the Code, such as those pertaining to checks, also may apply appropriately to cashier's checks.
[29] Consideration should be given to imposing a requirement that bank checks, and certified checks as well, must be presented for payment within six months. The purpose of bank checks is to place the credit of a bank behind the instrument to speed the flow of commerce. It is expected that these checks will be negotiated and collected promptly. In the unusual case where a bank check or certified check will be held for more than six months it could be excepted from such a rule by a legend placed in writing on the check itself. An amendment to this effect would avoid the absurd and costly consequences of the present rules which this case reveals.
[30] Fales v. Russell, 33 Mass. (16 Pick.) 315 (Sup.Jud.Ct. 1835), involved a similar claim. Defendants were the makers of notes which were indorsed in blank by the payee. The notes were stolen while held by plaintiffs. Notice was given to defendants promptly after the theft. Since defendants were exposed to the risk of double payment if the notes came into the hands of a holder in due course, judgment was entered in plaintiffs' favor conditioned on their posting a security bond running for the six-year period of limitations. See also Comment, "Automatic Discharge of Negotiable Instruments in the Proposed Commercial Code," 44 Ill.L.Rev. 88, 96-97 (1949).
[31] Subsection 3-122(4)(a), as originally enacted, provided that interest runs "in the case of the maker of a demand note, from the date of the demand." Since 3-122(4)(b) provided that "in all other cases" interest ran "from the date of accrual of the cause of action," it was feared that banks would have to pay interest on certified checks from the date of certification. N.J.Study Comment 7, N.J.S.A. 2A:3-122, noted this "unintended result" and recommended that 3-122 be redrafted because paying interest from the date of certification "was not standard practice." Subsection 3-122(4)(a) was amended accordingly by L. 1962, c. 218, § 2 to accomplish this purpose. New Jersey Comment, N.J.S.A. 12A:3-122, as amended. This is consistent with the recommendation made in 1962 by the Permanent Editorial Board for the UCC.
[32] See note 32, supra.
[33] Plaintiff's claim for interest was based upon the theory of unjust enrichment. A money judgment in plaintiff's favor was denied and, perhaps for this reason, no provision was made for the payment of interest to plaintiff.