**TPO INCORPORATED, Appellee,**

**v.**

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Eatontown National Bank, Appellant.**

**No. 72–1424.**

United States Court of Appeals, Third Circuit.

Argued April 30, 1973.

Decided June 28, 1973.

Submitted on Rehearing Aug 24, 1973.

On Rehearing Oct. 31, 1973.

Reavis & McGrath, New York City, Kaufman, Kaufman & Kaufman, Newark, N. J., for appellee; Stephen R. Steinberg, New York City, Samuel Kaufman, Newark, N. J., Paula B. Fenton, New York City, of counsel.

William E. Murane, Gen. Counsel, Myers N. Fisher, Asst. Gen. Counsel, Washington, D. C., Parsons, Canzona, Blair & Warren, Red Bank, N. J., for appellant; John Warren, Jr., Red Bank, N. J., of counsel.

Before WEIS, Circuit Judge, and NEWCOMER, District Judge.

## OPINION OF THE COURT

WEIS, Circuit Judge.

Should summary judgment be entered against a bank for refusal to honor its cashier's checks which it claims were obtained by the payee-holder as part of a fraudulent scheme to misapply bank funds? We arrive at a negative answer but only after necessary analysis of the procedural problems involved and the intricacies of negotiable instruments law.

The dispute is one of many spawned by the misapplication of the funds of the Eatontown National Bank by its President, Douglas Schotte, in the period from April, 1967 to August 7, 1970.

While the details of his activities are not completely clear from the record of this case, it appears that Schotte bought securities valued at more than $200,000,-000 during this time from various brokerage houses, including the defendant, a member of the New York and American Stock Exchanges. Ostensibly the stock was purchased for the account of the Bank, and payment was made from its funds by cashier's checks signed by Schotte.

It appears, however, that at least a portion of the stock purchases were for Schotte's personal speculation and that some of TPO's employees may have participated in the fraudulent scheme. TPO has denied any involvement, but, as the Court below indicated, the plaintiff's complicity is a matter of substantial dispute.

The ten cashier's checks on which the plaintiff filed this suit were issued on various dates between August 3, 1970 to August 5, 1970 to TPO and were delivered to it allegedly in exchange for securities ordered by Schotte. While TPO claims that the Bank received the stock certificates, the Liquidator appointed by the FDIC says that the securities were not among the assets in the Bank when it was closed on August 7, 1970. The record does not indicate to whom TPO delivered the certificates, although it is asserted that the transactions occurred in the plaintiff's New York office.

On August 7, 1970, the United States Comptroller of Currency declared the Bank to be insolvent, and the FDIC was appointed Receiver. When the ten cashier's checks, totaling $686,410.65, were presented to the Bank, the Receiver refused to pay them.

The plaintiff filed suit in the New York Supreme Court in accordance with a state procedure called "Motion for Summary Judgment in Lieu of Complaint" which is utilized where an action is based upon an instrument for payment of money. CPLR § 3213, McKinney's Consolidated Laws of New York. FDIC removed the case to the United States District Court for the Southern District

of New York, and it was later transferred to the District of New Jersey.[1]

No complaint or answer was filed by the parties in either district, although a number of affidavits were submitted in both the state and federal courts on behalf of the plaintiff and defendant. The Court below, feeling that the matters in dispute were sufficiently detailed in the sworn statements of record, proceeded to hear argument on plaintiff's Motion for Summary Judgment without repleading as was done in Instituto Per Lo Sviluppo Economico Dell' I. M. v. Sperti Prod., Inc., 47 F.R.D. 310 (S.D.N.Y. 1969).

The Court originally dismissed the motion because it felt "that it is absolutely essential to a determination of this case to establish whether in fact there was complicity by TPO in the Schotte scheme." However, after reargument, the Court entered judgment for the plaintiff on the theory that the delivery of the cashier's checks to TPO having completed the transactions between the Bank and the stockbroker, payment of the instruments was required. At the same time, however, the Court reserved to the defendant the right to litigate in another suit the issues of fraud and ultra vires actions claimed by the FDIC to have vitiated the stock transactions for which the cashier's checks had been issued.

In its opinion the District Court said:

". . . Having received adequate consideration for the issuance of the ten cashier's checks, the FDIC cannot now dishonor them. While it is alleged that losses sustained by ENB [the Bank] were due in part to the fraudulent acts of TPO, the ENB suffered no loss by issuing the cashier's checks for valuable securities. That transaction was valid and complete. Thus, it must be concluded as a matter of law that the FDIC is obligated to honor the ten cashier's checks. The alleged defense of a fraudulent conspiracy is more properly the subject of an independent suit.

"Thus, inextricably interwoven with this matter is the anticipated action to be instituted by the FDIC against TPO and several other brokerage houses for an alleged fraudulent scheme resulting in substantial losses to ENB. While ordinarily the compulsory counterclaim rule would come into play, an action under N.Y. CPLR § 3213 generally does not permit the filing of a counterclaim. . .

". . . Whatever possible cause of action the FDIC might have against TPO shall not be prejudiced by this decision . . . ."

We conclude that in the circumstances of this case:

1. The compulsory counterclaim rule is applicable;

2. Though not designated as such and vaguely stated, a defense and counterclaim based on fraud had been asserted through the documents filed by the defendant;

3. Judgment should not be entered on the plaintiff's claim unless it is determined that the defense and counterclaim have no factual basis;

4. FDIC is not precluded as a matter of law from proving its defense to the refusal to honor the cashier's checks.

While New York practice may not permit the filing of a counterclaim in the special procedure utilized by the plaintiff originally, the state rules became inoperative when the litigation was removed to the district court. The Federal Rules of Civil Procedure then became applicable, and the requirement for filing a compulsory counterclaim became effective. *See* F.R.C.P. 81(c); 13(a). For a discussion of the applicability of the compulsory counterclaim practice, *see* 6 Wright and Miller, Federal Practice and Procedure §§ 1411, 1412.

1. *See* opinion at 325 F.Supp. 663 (S.D.N.Y.1971).

The Court below was conscious of the pleading problem, and in his first letter to counsel advising that the case would be set for argument, the District Judge said:

". . . I am aware of the dissatisfaction of the FDIC of having to deal with a statutory procedure which is undoubtedly quite foreign to New Jersey counsel. However, upon closer examination I am sure counsel will find that the issues are plainly set forth albeit there is no complaint. I find the matter is appropriate for decision without repleading."

Thereafter in the first opinion, in a commendable exercise of discretion in placing substance over form, the District Court ordered that:

". . . the moving and answering papers shall be deemed the complaint and answer, respectively."

Insofar as our review of the record reveals therefore, FDIC was entitled to assume that it had asserted fraud both as a defense and as an affirmative claim against the plaintiff. While a more concise and specific statement might have sharpened the point, it is understandable why court and counsel were not concerned about the posture of pleadings at that stage. While the FDIC did file a separate suit against TPO after summary judgment had been granted, its action was in conformity with the suggestion of the court in its second opinion.

■ An appropriate resolution of the case at this point, however, requires us to assume that the counterclaim, in fact, had been properly asserted by the defense but had been precluded by the District Court's inadvertent reliance upon the New York statute. In our view the counterclaim is compulsory, and its presence weighs the scales against the grant of summary judgment.

Associated Hardware Supply Co. v. The Big Wheel Distributing Company, 355 F.2d 114 (3rd Cir. 1966), dealt with a factual situation not unlike that in the case *sub judice*. Associated Hardware sued on a contract whose existence could not be effectively controverted. The defense counterclaimed on a theory of fraud. Judge Staley, writing for this Court, said:

"Since the parole evidence rule, under the circumstances here, does not apply, and as we later demonstrate, the counterclaim was improperly dismissed, we think the entry of summary judgment on the principal claim was untimely." At 119.

"Although we agree that there were no genuine issues of material fact as to the contract, we are just as certain that the district court committed error in granting summary judgment on the issue of fraud, as raised in both the answer and counterclaim, and on the remaining counterclaims . . . Thus, fraud, as alleged here, is an independent action, the recovery for which may be set off against or may even exceed the amounts due and owing under the contract." At 120–121.

The opinion is in accord with other authority which questions the advisability of the entry of judgment against one party if it appears that ultimately he may recover judgment against the moving party after trial. *See* 3 Barron & Holtzhoff, Federal Practice & Procedure, § 1241. Particular caution also must be exercised when the claim and counterclaim are so closely related that an issue of fact in one may prove to be important to both.

We see no special circumstances in the record which would favor the entry of judgment in favor of TPO at this time when it is possible that subsequent litigation may require a return of the sum awarded and perhaps additional monies. *See* Rule 54(b), 3 Moore's Federal Practice § 13.16.

The lower Court's entry of judgment was based on the premise that the Uniform Commercial Code as enacted by the State of New Jersey, particularly N.J. S.A. 12A:4–303, created an absolute obligation on the Bank to honor its cashier's checks. While that proposition may be true in most instances, we find it not applicable in the unusual posture of the parties in this fact situation.

It is critical to the basic issue in this case to emphasize that the dispute is between the FDIC, standing in the shoes of the Bank, and TPO, the party which participated in the allegedly fraudulent transactions in which the checks played a part. There are no third parties, or customers of the Bank, or holders in due course whose rights are involved, at least under the most favorable theory that may be advanced to support the defendant's counterclaim. Hence the strong considerations of public policy favoring negotiability and reliability of cashier's checks are not germane.

The pertinent portions of the Uniform Commercial Code, upon which the lower Court relied, read in part:

"§ 4–303. When Items Subject to Notice, Stop-Order, Legal Process or Set-off; Order in Which Items May Be Charged or Certified.—

(1) Any knowledge, notice or stop-order received by, legal process served upon or set-off exercised by a payor bank, whether or not effective under other rules of law to terminate, suspend or modify the bank's right or duty to pay an item or to charge its customer's account for the item, comes too late to so terminate, suspend or modify such right or duty if the knowledge, notice, stop-order or legal process is received or served and a reasonable time for the bank to act thereon expires or the set-off is exercised after the bank has done any of the following:

(a) accepted or certified the item;
*   *   *"

"§ 3–410. Definition and Operation of Acceptance.—

(1) Acceptance is the drawee's signed engagement to honor the draft as presented. It must be written on the draft, and may consist of his signature alone. It becomes operative when completed by delivery or notification.
*   *   *"

The District Court also relied upon two cases, State of Pennsylvania v. Curtiss National Bank, 427 F.2d 395 (5th Cir. 1970), and National Newark & Essex Bank v. Giordano, 111 N.J.Super. 347, 268 A.2d 327 (Law Div.1970). Both are distinguishable in that they involve third parties and part of the reasoning included in the opinions is not applicable here.

A logical beginning for discussion is a consideration of the nature of a cashier's check.

State of Pennsylvania v. Curtiss National Bank, *supra*, describes the instrument as follows:

"The cashier's check, purchased for adequate consideration, unlike an ordinary check, stands on its own foundation as an independent, unconditional and primary obligation of the Bank." (427 F.2d at 400).

Earlier in the opinion the Court had said:

"A cashier's check is defined as a bill of exchange drawn by a bank upon itself and accepted in advance by the act of its issuance and not subject to countermand by either its purchaser or the issuing bank."

and listed a number of citations, including Polotsky v. Artisans Savings Bank, 37 Del. 151, 188 A. 63.

The latter case, however, explained the lack of authority to countermand by saying:

"The instrument therefore being one of primary obligation on the part of the bank, there can be no countermand by it *such as exists where the document constitutes a mere direction or order to pay.*" (emphasis supplied)

Whether "acceptance" in the definition of a cashier's check has validity today is disputed by the authors of Willier and Hart, 6C Bender's Uniform Commercial Code Reporter-Digest, 2–1194:

"A bank may draw a cashier's check either on itself or on another bank. When drawn on another bank, the check is governed by the same rules as any other check; when—as here— drawn by the bank on itself, the check is effective as a note under Section

3–118(a), with the bank as maker. Thus the court erred in referring to the instrument as a draft which had been accepted. '. . ."

■ In any event, while a cashier's check is equivalent to a negotiable promissory note of a bank, it is not the same as cash as has been loosely asserted, and the cases discussing this particular type of instrument must be carefully analyzed. It is important, also, to note that discussions about a *customer's* right to stop payment on a check under § 4–403 are not helpful but only tend to confuse the issue presented here.

State of Pennsylvania v. Curtiss National Bank, *supra,* was concerned with a situation where a series of transactions, separate and apart from the issuance of the cashier's check, was involved. The Court made it clear that it required the bank to honor the cashier's check because the payee was not a party to the specific agreement in which the issuance of the cashier's check played a part. The Court of Appeals recognized the possibility of a defense on the ground of failure of consideration if the payee were not a holder in due course but concluded:

". . . Bankers Allied [payee] was not in any way a party to this agreement and thus cannot be required to return the $150,000, represented by the cashier's check, because of the failure of consideration contemplated by the agreement.

". . . The Bank was in no way a party to this agreement and thus cannot do what it apparently is attempting to do here and assert whatever colorable right the Borrowers might have to seek what amounts to a rescission of the stock purchase from Bankers Allied [payee]."

While the National Newark Bank case, *supra,* also cited by the Court below, may have reached the correct result in holding that the Bank had a duty to honor its cashier's check under the facts involved there, its reasoning has been criticized, and we decline to consider it authoritative.[2]

We think that a correct analysis of the position of the parties here is that the Bank had engaged to pay the check but, if the plaintiff is not a holder in due course, under § 3–306 and § 3–408 the Bank or the FDIC is entitled to present all defenses which would be available on a simple contract including one of lack of consideration or fraud.[3]

Finally, we point out that § 1–103 of the Code provides that:

"Unless displaced by the particular provisions of this Act, the principles of law and equity including the law merchant and the law relative to . . principal and agent, . . . fraud, . . . or other validating or invalidating cause shall supplement its provisions."

The District Court's initial reaction to the contentions of the parties was correct, and summary judgment was improvidently entered.

We do not intend in any fashion to pass upon the merits of the defense or

2. Willier and Hart, U.C.C. Reporter-Digest, supra, comment on the case as follows: "The court is not correct. Even though a cashier's check is one drawn by a bank upon itself and, under Section 3-118(a), is effective as a note, the bank is not deprived of its right to stop payment since there was no acceptance under Section 3-410. The real issue was whether the defendant, who procured issuance of the check, had a right to have the bank stop payment. * * * As the court points out, the defendant probably had a cause of action for fraud or breach of contract against the seller. * * * This was not the bank's defense, and the court °

is correct that, absent an indemnity, the bank would have no obligation to stop payment under Section 4-403."

3. See 1 Michie on Banks and Banking 345, "Although there are cases to the contrary, generally cashier's checks are not subject to countermand except for fraud, and are irrevocable in the hands of a holder in due course."

See also Ross v. Peck Iron & Metal Co., 264 F.2d 262, 269 (4th Cir. 1959): ". . . Since the law is perfectly clear that a cashier's check cannot legally be countermanded or dishonored when presented by a holder in due course . . . ."

counterclaim, nor do we mean to preclude summary judgment in favor of the plaintiff if, upon more complete development of the facts, the FDIC is unable to present competent evidence to support its position. Our conclusion is simply that there were sufficient allegations presented by the defendant which require furter proceedings in the trial court.

The judgment of the District Court will be reversed and the case remanded for further proceedings not inconsistent with this opinion.

### On Petition for Rehearing

Before GIBBONS and WEIS, Circuit Judges and NEWCOMER, District Judge.

### OPINION OF THE COURT

#### PER CURIAM:

At the urging of the appellee, we have carefully reconsidered our opinion in this case, performed further research into the problems involved, but find no reason to alter the decision we reached previously.

TPO's Petition for Rehearing misconceives the nature and scope of our holding in this case. We emphasize once more that the decision was not concerned with a "stop order" by the purchaser of a cashier's check since no purchaser was involved and no stop order was ever issued. The fact is that the check purports to be one drawn by the bank upon itself.

■ The issue is simply whether a bank may refuse to honor its cashier's check when it is presented by the payee who is not a holder in due course but rather a party whose scheme to defraud the bank includes the issuance of the instrument.[1]

■ The appellee's claim that, in violation of the principle set out in Aldrich v. Chemical National Bank, 176 U.S. 618, 20 S.Ct. 498, 44 L.Ed. 611 (1900), we have allowed the bank to defend the action on the checks while retaining the securities which represent the consideration for the transaction. If our opinion left any doubt on this point, we wish to make it clear that it is a question of fact, not susceptible of summary judgment on the present record, whether ENB did receive the securities. While there appears to be some evidence that the bank may have negotiated one of the securities transferred by TPO, there is a significant lack of information on whether the remaining stock certificates ever came into the bank's possession.[2]

---

1. A summary of the decisional law may be found in Brady on Bank Checks, 1973 Cum. Supp.:

    "§ 10.2. *Bank's obligation to pay checks.* The principal text indicates that a bank's obligation to pay a check runs to its own customer, the drawer, and not to the payee or holder. The principal text also points out that the payee of a cashier's check has no cause of action against the issuing bank for wrongful dishonor of such cashier's check.

    "On the other hand, it is clear under the Uniform Commercial Code that the bank by the mere act of issuing a cashier's check binds itself to pay the instrument, and cannot stop payment on it, even where the purchaser or person who procured its issuance has a claim arising from the underlying transaction which gave rise to the instrument. In other words, a bank is in a position of an acceptor (or certifying bank) by the mere act of issuing and delivering a cashier's check. However, an exception to this rule may exist where the bank itself deals directly with the payee of the cashier's check."

    We agree from our research that such an exception does exist, as indicated by the authorities cited in our earlier opinion. We note also a similar holding in Wilmington Trust Co. v. Delaware Auto Sales, Del.Supr., 271 A.2d 41 (Del.1970).

2. The maneuverings of Schotte and his accomplices were too extensive and complicated to permit us to use the tunnel vision approach suggested by TPO. Its affidavit says that the checks were delivered at its offices in New York in exchange for the stock certificates. Curiously, the affidavit does not identify the individual who received the documents. A review of the record in United States v. Perry, 474 F.2d 1338 (3rd Cir. 1972), where this court affirmed the conviction of one of Schotte's accomplices, demonstrates that at one stage the use of messengers, who were also employees of, or relatives of employees

We think that there is insufficient evidence to find that the transaction was complete and valid. Furthermore, the lower court's conclusion was influenced to some extent by appellee's erroneous· contention, which it is still unwilling to abandon, that state, not federal rules of procedure, govern the filing of a counterclaim.

We reaffirm the opinion of this court and in accordance therewith, the judgment of the district court will be reversed and the case remanded for further proceedings not inconsistent with our opinions.

Hays, Circuit Judge, filed an opinion concurring in the result; Oakes, Circuit Judge, filed a dissenting opinion.

of TPO, combined with prearranged meetings on the Garden State Parkway by the participants, were means used to carry out the scheme. Whether this type of operation prevailed in August of 1970 when the transactions involved here took place, remains to be developed.