Antonio DA SILVA and Maria De Lourdes C.F.M. Da Silva, Plaintiffs,

v.

James C. SANDERS, Administrator, United States Small Business Administration, et al., Defendants.

Civ. A. No. 83–2937.

United States District Court, District of Columbia.

Nov. 19, 1984.

Morton A. Faller and Keith A. Rosenberg, Meyer, Faller & Weisman, P.C., Washington, D.C., for plaintiffs.

Richard T. Tomar, Philipson, Mallios & Tomar, P.C., Washington, D.C., for Nat. Bank of Washington (codefendant).

John H.E. Bayly, Jr., Asst. U.S. Atty., Washington, D.C., for Small Business Admin. (codefendant).

## MEMORANDUM AND ORDER

CORCORAN, Senior District Judge.

### A. *Facts*

Antonio and Maria Da Silva (plaintiffs) were principal shareholders in a District of Columbia corporation known as April in Portugal Masonry, Inc. (April in Portugal). To cover a loan, April in Portugal executed a $50,000 promissory note in favor the Riggs National Bank of Washington (Riggs). The United States Small Business Administration (SBA) and the plaintiffs guaranteed the note. The plaintiffs secured their guaranty with their personal residence. April in Portugal defaulted on the note in May 1979, and the SBA thereupon purchased the note and plaintiffs' guaranty from Riggs.

On June 15, 1979, April in Portugal filed a petition in bankruptcy. Consequently, under the terms of the note, the entire unpaid principal became due and payable. From the bankruptcy estate and from redemption of certain stock, the SBA received $32,935.49 as partial payment of the unpaid principal. The plaintiff advised the SBA that they would sell their home to pay the remaining balance.

Homestead Settlement Company (Homestead) sold the plaintiffs' house on June 19, 1981. On July 8, 1981 a personal check payable to Homestead for $141,092 was deposited in Homestead's escrow account at the National Bank of Washington (NBW). Five days later, NBW issued and delivered to Homestead a $10,000 cashier's check payable to SBA. NBW had relied on the proceeds from the $141,092 personal check to serve as consideration for the cashier's check, even though the personal check had not cleared the proper banking channels.

Homestead forwarded the cashier's check to the SBA to satisfy the plaintiffs' loan obligation. The SBA received the cashier's check on July 28, 1981, and, on the following day, mailed to Homestead the necessary documents to release the plaintiffs' obligation and SBA's lien on their property.

On August 28, 1981, the SBA's Denver Fiscal Office deposited the cashier's check in its Denver bank. The check cleared the Federal Reserve Bank (FRB), and, on August 31, 1981, the cashier's check was presented to NBW for payment. More than a month earlier, however, a Florida bank had returned the $141,092 personal check "payment stopped," because the personal check had been stolen or forged. Further investigation showed that Homestead had closed shop and left town. Consequently, NBW refused to honor its cashier's check, claiming fraud and lack of consideration. In turn, SBA attempted to regain its secured position on plaintiffs' residence through the local deeds office and refused to credit plaintiffs' records for any amount covered by the cashier's check.

On October 4, 1983, the plaintiffs filed a complaint against the SBA alleging breach of contract and fiduciary duty. On January 17, 1984, the SBA cross-claimed against

the NBW for wrongful dishonor of the cashier's check.[1]

Both SBA and NBW have moved for summary judgment.[2] We find no genuine issue of material fact.[3] Accordingly, we must decide whether the Uniform Commercial Code in the District of Columbia allows the NBW to dishonor its cashier's check because of fraud or lack of consideration, notwithstanding that the payee of the cashier's check, the SBA, is an innocent party.

## B. *Discussion*

■ A cashier's check is a negotiable instrument drawn by a bank upon itself. *Swiss Credit Bank v. Virginia National Bank*, 538 F.2d 587, 588 (4th Cir.1976); *Munson v. American National Bank & Trust Co.*, 484 F.2d 620, 624 (7th Cir.1973); Michie on Banks and Banking, ch. 12, § 13 at 359 (1984). Although the common belief is that cashier's checks are the same as cash, the provisions of the Uniform Commercial Code (UCC) give no indication as to how the courts should treat them,[4] and, since the enactment of the UCC in 1965, the District of Columbia courts have of-fered no guidance.[5] Consequently, we examine how other jurisdictions have construed the statutory language of the UCC and what role equity plays in determining whether banks may dishonor their cashier's checks.

### 1. *The Two Statutory Approaches*

Courts in other jurisdictions have divided sharply as to when a bank has a defense which arises from the purchase of a cashier's check. *See generally* L. Lawrence, *Making Cashier's Checks and Other Bank Checks Cost Effective: A Plea For Revision of Articles 3 and 4 of the Uniform Commercial Code*, 64 Minn.L.Rev. 275, 285–320 (1980) [hereinafter cited as Lawrence, *Cashier's Checks*]. One group considers cashier's checks as ordinary negotiable instruments and treats them as such under the UCC. *Id.* at 286. According to these courts, if the payee of the cashier's check is a holder in due course, the bank may only raise real defenses before dishonoring its cashier's check. D.C.Code Ann. § 28:3–305.[6] However, if the payee is not

1. Plaintiffs had also named NBW as a codefendant in this case, charging wrongful dishonor of cashier's check and negligence. Complaint ¶¶ 34–47 (filed Oct. 4, 1983). However, NBW moved to dismiss these counts because the plaintiffs were not real parties in interest as required by Fed.R.Civ.P. 17(a). Motion to Dismiss Complaint as to the Defendant (filed Nov. 4, 1983). On March 8, 1984, the Court granted NBW's motion. Memorandum and Order (filed Mar. 8, 1984).

2. On September 26, 1984, the plaintiffs responded to SBA's and NBW's motions for summary judgment. Plaintiffs' Response to Motion for Summary Judgment of Federal Defendants and Response to Third Party Defendant Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (filed Sept. 26, 1984). They ask us to grant SBA's motion for summary judgment, *id.* at 1, but also discuss issues concerning possible refunds by the SBA. In addition, the plaintiffs respond to SBA's questions concerning restrictions on this Court's jurisdiction under the Tucker Act, 28 U.S.C. § 1346(a)(2). We do not choose to address these issues in this memorandum and order.

3. The SBA outlined the material facts in this case in its Federal Defendant's Statement of Uncontested Material Facts (filed Sept. 4, 1984). In its opposition, the NBW failed to file a statement of genuine issues. Third-Party Defendant the National Bank of Washington's Opposition to Federal Defendant's Motion for Summary Judgment. Accordingly, we may assume that NBW has admitted the facts in SBA's statement. Local Rule 1–9(h). Another source for our statement of facts was the unquestioned Affidavit of the National Bank of Washington (filed Aug. 29, 1984).

4. The Code's only reference to cashier's checks is D.C.Code Ann. § 28:4–211 (1981), which enumerates the types of payment that collecting banks may take in settlement of an instrument for the payment of money.

5. One pre-UCC case, *Whitehead v. American Security and Trust Co.*, 285 F.2d 282 (D.C.Cir.1960) (en banc), did decide this issue, holding that equity requires the bank to honor its cashier's check. We discuss this case below.

6. D.C.Code Ann. § 28:3–305 reads:
   To the extent that a holder is a holder in due course he takes the instrument free from
   (1) all claims to it on the part of any person; and
   (2) all defenses of any party to the instrument with whom the holder has not dealt except
   (a) infancy, to the extent that it is a defense to a simple contract; and

a holder in due course, the bank may dishonor a cashier's check by simply asserting personal defenses, including lack of consideration and fraud in the inducement. *Id.* at § 28:3–306.[7]

The other group of courts treats cashier's checks as cash equivalents and disallows banks from asserting those defenses that drawers of ordinary negotiable instruments may raise pursuant to sections 305 and 306. Lawrence, *Cashier's Checks*, at 286. In sum, these courts focus less on the status of the payee and more on the fact that the bank backs its cashier's checks with its own credit.

Below we summarize and examine the statutory arguments of these courts. In our discussion, we label as Group A those courts that treat cashier's checks like ordinary negotiable instruments and as Group B the courts that view cashier's checks as cash equivalents.

### a. Group A: The Ordinary Negotiable Instrument Approach

The Group A courts offer two different analyses in their treatment of cashier's checks as ordinary negotiable instruments. Some rely on UCC § 3–118(a) which states that "[a] draft drawn on the drawer is effective as a note."[8] Because the bank draws on itself when it issues a cashier's check, these courts treat the cashier's

check as a note and the bank as the note's maker. Hence, they argue that, because a cashier's check is nothing more than a note, the defenses of sections 305 and 306 are available. *See, e.g., TPO Inc. v. Federal Deposit Insurance Corp.*, 487 F.2d 131, 135–36 (3d Cir.1973); *Banco Ganadero y Agricola v. Society National Bank*, 418 F.Supp. 520, 524 (N.D.Ohio 1976).

Other Group A courts look to the acceptor's contract in UCC § 3–413(1).[9] These courts argue that a cashier's check is a draft of the issuing bank that the bank accepts by the act of issuance. However, they point out that—pursuant to UCC § 3–413(1)—the acceptor's contract is identical to the maker's contract. Because makers are subject to the provisions of UCC §§ 3–305 and 3–306, these courts argue that sections 305 and 306 should also govern cashier's checks. *See, e.g., Rezapolvi v. First National Bank of Maryland*, 296 Md. 1, 459 A.2d 183, 187–88 (1983); *Santos v. First National State Bank*, 186 N.J.Super. 52, 451 A.2d 401, 407 (1982).

We believe, as does Professor Lawrence, that the Group A courts misconstrue the application of UCC § 3–118(a) and § 3–413(1). Professor Lawrence explains: UCC § 3–118(a) "was intended simply to eliminate the need for a holder of a note or accepted draft to protest or give notice of

(b) such other incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity; and

(c) such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms; and

(d) discharge in insolvency proceedings; and

(e) any other discharge of which the holder has notice when he takes the instrument.

**7.** D.C.Code Ann. § 28:3–306 reads:

Unless he has the rights of a holder in due course any person takes the instrument subject to

(a) valid claims to it on the part of any person; and

(b) all defenses of any party which would be available in an action on a simple contract; and

(c) the defenses of want or failure of consideration, nonperformance of any condition precedent, nondelivery, or delivery for a special purpose (section 28:3–408); and

(d) the defense that he or a person through whom he holds the instrument acquired it by theft, or that payment or satisfaction to such holder would be inconsistent with the terms of a restrictive indorsement. The claim of any third person to the instrument is not otherwise available as a defense to any party liable thereon unless the third person himself defends the action for such party.

**8.** *See* D.C.Code Ann. § 28:3–118(a).

**9.** D.C.Code Ann. § 28:3–413(1) reads:

(1) The maker or acceptor engages that he will pay the instrument according to its tenor at the time of his engagement or as completed pursuant to section 28:3–115 on incomplete instruments.

dishonor to the instrument's maker or acceptor. The draftsmen of the Code recognized that requiring these parties to protest or give notice of dishonor would serve no function, since presumably they should already be aware of their own refusal to pay." Lawrence, *Cashier's Checks* at 288. Similarly, UCC § 3–413(1) "was designed to deal with the effect of alteration, and to set out the procedural conditions precedent to the liability of the instrument's acceptor or maker. Neither sections 3–118(a) nor 3–413 were drafted with the aim of specifying the defenses available to obligors." *Id.* Accordingly, we look to the Group B courts for guidance.

### b. *Group B: The Cash Equivalent Approach*

A majority of Group B courts which treat cashier's checks as cash equivalents have cited UCC § 4–303 for support. That provision reads in part:

> Any knowledge ... or stop-order received by ... a payor bank, whether or not effective under rules of law to terminate ... the bank's ... duty to pay an item ... comes too late to so terminate ... such ... duty if the knowledge ... [or] stop-order ... is received ... and ... the setoff is exercised after the bank has ... accepted ... the item ....[10]

These courts reason that a bank accepts a cashier's check as soon as the bank issues the check.[11] Accordingly, the bank cannot refuse payment of a cashier's check under sections 305 or 306 because such refusal is, in effect, a stop-order, and UCC § 4–303 disallows stop-orders on accepted items. *See, e.g., Swiss Credit Bank v. Virginia National Bank,* 538 F.2d 587, 588 (4th Cir.1976); *Munson v. American National Bank & Trust Co.,* 484 F.2d 620, 623–24 (7th Cir.1973); *State ex rel. Chan Siew Lai v. Powell,* 536 S.W.2d 14, 16 (Mo.1976) (en banc); *Wertz v. Richardson Heights Bank and Trust,* 495 S.W.2d 572, 574 (Tex.1973).

Several courts and commentators have criticized this application of UCC § 4–303. They state that the concept of stopping payment has relevance only to relations between a bank and its customer who draws a check against the bank. A personal check is an order to pay, and a customer has the right to revoke the order before it is carried out. But, since the bank, as drawer and drawee, is its own customer when it issues a cashier's check, it is nonsensical, the critics argue, to speak of the bank's liability to itself for failing to stop payment on its own cashier's check. *See, e.g., Rezapolvi v. First National Bank of Maryland,* 296 Md. 1, 459 A.2d 183, 188 n. 7 (1983); *Santos v. First National State Bank,* 186 N.J.Super. 52, 451 A.2d 401, 408 (1982); J. McDonnell, *Freedom From*

**10.** D.C.Code Ann. § 28:4–303(1) reads in full: (1) Any knowledge, notice or stop-order received by, legal process served upon or setoff exercised by a payor bank, whether or not effective under other rules of law to terminate, suspend or modify the bank's right or duty to pay an item or to charge its customer's account for the item, comes too late to so terminate, suspend or modify such right or duty if the knowledge, notice, stop-order or legal process is received or served and a reasonable time for the bank to act thereon expires or the setoff is exercised after the bank has done any of the following:

(a) accepted or certified the item;

(b) paid the item in cash;

(c) settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule or agreement;

(d) completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith or otherwise has evidenced by examination of such indicated account and by action its decision to pay the item; or

(e) become accountable for the amount of the item under subsection (1)(d) of section 28:4–213 and section 28:4–302 dealing with the payor bank's responsibility for late return items.

**11.** UCC § 3–410(1) and D.C.Code Ann. § 28:3–410(1) define acceptance:

Acceptance is the drawee's signed engagement to honor the draft as presented. It must be written on the draft, and may consist of his signature alone. It becomes operative when completed by delivery or notification.

These courts argue that the bank officer's signature on the bank's cashier's check constitutes acceptance when the check is "delivered" or issued.

*Claims and Defenses: A Study In Judicial Activism Under the Uniform Commercial Code,* 17 Ga.L.Rev. 569, 615 (1983); Lawrence, *Cashier's Checks,* at 292 n. 59.

■ But we believe the foregoing reading of UCC § 4–303 may be unjustifiably narrow. Although the concept of a stop-order may necessitate both a bank and a bank customer, the application of UCC § 4–303 is not restricted to stop-orders. UCC § 4–303 also includes "any *knowledge* ... received by a payor bank." Accordingly, as we read UCC § 4–303, a bank may not dishonor any accepted item when it receives later knowledge that would otherwise terminate its duty to honor that item. It follows that the defenses of sections 305 and 306 are not available when such defenses are based on knowledge that is received after the bank has accepted the item. In such circumstances—because a cashier's check is an accepted item—the bank may not dishonor a cashier's check.[12]

We believe that this interpretation of UCC § 4–303 adheres to the UCC rules of construction. UCC § 1–102 states that the Code "shall be liberally construed and applied to promote its underlying purposes and policies." One such underlying purpose and policy is "to permit the continued expansion of commercial practices through custom [and] usage ...." UCC § 1–102(2)(b). Cashier's checks have always played a significant role in commercial practices. People and businesses have come to view cashier's checks as cash because such treatment furthers certainty in commercial transactions. As one New Jersey court elaborated:

A cashier's check circulates in the commercial world as the equivalent of cash.... People accept a cashier's check as a substitute for cash because the bank stands behind it, rather than an individual. In effect the bank becomes a guarantor of the value of the check and pledges its resources to the payment of the amount represented upon presentation. To allow the bank to stop payment on such an instrument would be inconsistent with the representation it makes in issuing the check. Such a rule would undermine the public confidence in the bank and its checks and thereby deprive the cashier's check of the essential incident which makes it useful. People would no longer be willing to accept it as a substitute for cash if they could not be sure that there would be no difficulty in converting it into cash.

*National Newark & Sussex Bank v. Giordano,* 111 N.J.Super. 347, 268 A.2d 327, 329 (1970). Because certainty promotes the expansion of commercial practices, we believe our interpretation of UCC § 4–303 heeds to the mandate of UCC § 1–102.[13] *See State ex rel. Chan Siew v. Powell,* 536 S.W.2d 14, 16 (Mo.1976) (en banc) ("The nature and usage of cashier's checks in the commercial world is such that public policy does not favor a rule that would permit

---

**12.** Although we believe that our reading of UCC § 4–303 is straightforward, we know of no other court that has adopted our particular construction.

**13.** This is not a case where the payee of the cashier's check deals directly with the bank and engages in some fraud to obtain issuance of the check from the payor bank or where there has been a lack of consideration running from the payee who deals directly with the payor bank. *See, e.g., Anderson, Clayton & Co. v. Farmers National Bank,* 624 F.2d 105 (10th Cir.1980) (payee fraudulently induces bank to issue cashier's check); *TPO, Inc. v. Federal Deposit Insurance Corp.,* 487 F.2d 131, 137 & n. 1 (3d Cir. 1973) (noting exception when bank deals directly with payee); *Wilmington Trust Co. v. Delaware Auto Sales,* 271 A.2d 41 (Del.1970) (bank deals directly with purchaser of automobile);

*Wertz v. Richardson Heights Bank and Trust,* 495 S.W.2d 572, 575 (Tex.1973) (Walker, J. dissenting) ("a bank from which a cashier's check has been procured by fraud would certainly be entitled to set up the fraud and defeat liability as long as the check remained in the hands of the payee who perpetrated the fraud."). Under such circumstances, several courts have noted that "the strong considerations of public policy favoring negotiability and reliability of cashier's checks" are not present and therefore a bank may refuse payment. *Anderson, Clayton & Co. v. Farmers National Bank,* 624 F.2d 105, 110 (10th Cir.1980); *TPO, Inc. v. Federal Deposit Insurance Corp.,* 487 F.2d 131 (3d Cir.1973). Indeed, principles of equity may not require the ·bank to honor its cashier's check. UCC § 1–103.

stopping payment of them."); White & Summers, Uniform Commercial Code § 17–6, at 681 n. 110 (2d ed. 1980). (The public treats cashier's checks as the equivalent of cash, and the draftsmen did not intend to overturn this public expectation.); *cf. Bristol Associates, Inc. v. Girard Trust Bank,* 505 F.2d 1056, 1062 (3d Cir.1974) ("Where language is susceptible of two reasonable meanings, a court, in the commercial field, should choose that interpretation which comports with current universal practice in the business world.").

Here, NBW ultimately discovered that its cashier's check had been issued due to fraud and for no consideration. However, NBW received this knowledge only after NBW had accepted the cashier's check through issuance. NBW cannot now rely on UCC §§ 3–305 and 3–306 to dishonor its cashier's check because knowledge of the fraud and lack of consideration comes too late under UCC § 4–303. NBW has no choice but to pay.

### 2. Principles of Equity

Equity also requires the bank to honor its cashier's checks with respect to innocent third parties. D.C.Code Ann. § 28:1–103 (principles of equity supplement the UCC).[14] In a pre-UCC case from the Court of Appeals for the District of Columbia Circuit, a bank refused to honor its cashier's check because the payee was not a holder in due course. *Whitehead v. American Security and Trust Company,* 285 F.2d 282, 283 (D.C.Cir.1960) (en banc).[15] The bank claimed that it had issued the

cashier's check due to a third-party fraud on the bank, though the payee herself was an innocent party to that fraud. The Court of Appeals noted that the payee was without opportunity to protect herself from fraud, while the bank could protect itself by requiring an indemnity bond. *Id.* at 283–84. Ordering the bank to honor its cashier's check, the court held: "Since the obligation of the bank to appellant as owner of the [cashier's check] was not discharged by this [fraud], with the consequence that one of the two innocent parties, the payee and the bank, must suffer the loss, equity casts it ... upon the one who has most trusted the party through whom the loss came." *Id.* at 284.

This principle of equity applies here. Both the SBA and the NBW are innocent parties to the fraud perpetrated by Homestead. However, NBW could have required a bond or awaited the clearance of Homestead's personal checks. NBW did neither. Therefore, with respect to cashier's checks, we agree with the Court of Appeals: Between two innocent parties, equity casts the loss upon the party who has trusted the third-person through whom the loss came and who was in a position to protect itself. In this case, NBW should bear the loss.[16]

### C. Conclusion and Order

For the above reasons, we hold that NBW cannot refuse to dishonor its cashier's check. It is accordingly,

---

**14.** D.C.Code Ann. § 28:1–103 reads in part: Unless displaced by the particular provisions of this subtitle, the principles of ... equity ... shall supplement its provisions.

**15.** The court of appeals used the term "treasurer's check" in *Whitehead.* 285 F.2d at 283. However, the authorities agree that a treasurer's check is the same thing as a "cashier's check." Reitman, 6 Banking Law § 133.10[4], at 133–62 (1984).

**16.** A separate equity argument also favors SBA. Under D.C.Code Ann. § 28:3–802, the payee of a cashier's check loses his rights against the purchaser when the payee accepts the cashier's check for payment of the underlying debt. *See Moon Over the Mountain, Ltd. v. Marine Mid-*

land Bank, 87 Misc.2d 918, 386 N.Y.S.2d 974, 976 (N.Y.Civ.Ct.1976). In other words, under § 28:3–802, the SBA lost any rights it may have had against Homestead when the SBA accepted the cashier's check from NBW. As one court noted: "To permit [the] bank to avoid liability ... on account of the [bank's refusal to pay] ... would result in an obvious inequity." *Meckler v. Highland Falls Savings & Loans Ass'n,* 64 Misc.2d 407, 314 N.Y.S.2d 681 (N.Y.Sup.Ct. 1970); *but see Santos v. First National State Bank,* 186 N.J.Super. 52, 451 A.2d 401, 409 (1982) (inequity can be resolved by applying principles of equity and allowing payee to sue purchaser despite § 3–802).

ORDERED that the motion for summary judgment of the defendant NBW against the defendant SBA be DENIED, and it is further

ORDERED that the motion for summary judgment of the defendant SBA against the defendant NBW be GRANTED.