Nos. 2--07--0064 & 2--07--0158 cons.      Filed:  6-2-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| MIDAMERICA BANK, FSB, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 02--L--706 |
| | ) | |
| CHARTER ONE BANK, FSB, | ) | |
| | ) | |
| Defendant and Third-Party | ) | |
| Plaintiff-Appellant | ) | |
| | ) | |
| (David Hernandez, Gina M. Nelson | ) | |
| Hernandez, Mary Christelle, and Essential | ) | Honorable |
| Technologies of Illinois, Inc., Third-Party | ) | John T. Elsner, |
| Defendants-Appellees). | ) | Judge, Presiding. |

| | | |
|---|---|---|
| MIDAMERICA BANK, FSB, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 02--L--706 |
| | ) | |
| CHARTER ONE BANK, FSB, | ) | |
| | ) | |
| Defendant and Third-Party | ) | |
| Plaintiff-Appellee | ) | |
| | ) | |
| (David Hernandez, Gina M. Nelson | ) | |
| Hernandez, Mary Christelle, and Essential | ) | Honorable |
| Technologies of Illinois, Inc., Third-Party | ) | John T. Elsner, |
| Defendants-Appellees). | ) | Judge, Presiding. |

JUSTICE O'MALLEY delivered the opinion of the court:

In this consolidated appeal of the trial court's ruling after a bench trial, defendant Charter One Bank (Charter One) appeals the trial court's ruling that Charter One was liable to plaintiff MidAmerica Bank (MidAmerica) for the $50,000 value of a cashier's check Charter One had refused to honor, and MidAmerica appeals the trial court's ruling denying it attorney fees. For the reasons that follow, we reverse in part and affirm in part.

The parties do not dispute the basic underlying facts. Mary Christelle, the mother of David Hernandez (who was also president of Essential Technologies of Illinois, Inc. (ETI)), purchased a $50,000 check payable to ETI with funds from her Charter One account, and the check was deposited in ETI's account at MidAmerica. Four days after ETI deposited the cashier's check, Christelle asked Charter One to stop payment on the check. Charter One did so and subsequently refused to honor the check when MidAmerica presented it for payment. Charter One returned the check to MidAmerica with a "stop payment" stamp across the front, and MidAmerica sent the check to ETI after removing the $50,000 credit from ETI's account. Within two weeks, the balance of ETI's MidAmerica account dropped to approximately negative $52,000 due to a series of checks that were returned for insufficient funds. MidAmerica closed the account and instigated a lawsuit in which it was assigned ETI's interest in the $50,000 check. MidAmerica then filed the present suit against Charter One to recover the value of the check, and Charter One in turn filed a third-party complaint against Christelle, David Hernandez, his wife Gina M. Nelson Hernandez, and ETI. Though a copy of the cashier's check was used as an exhibit at trial, the parties were unable to produce the original cashier's check. Some testimony indicated that the check may have been in an out-of-state ETI office, but there was no definitive evidence as to the check's location.

After hearing testimony and receiving other evidence, the trial court ruled that Charter One was obligated to honor its cashier's check and thus was liable to MidAmerica for $50,000, because "[t]he law under the [Uniform Commercial Code (Code) (810 ILCS 5/1--101 et seq. (West 2002))] is that [cashier's checks] are as good as currency." The court further found that ETI and David and Gina Hernandez had used Christelle as a pawn in a check-kiting scheme to defraud Charter One and that Charter One was entitled to a judgment against them for the same $50,000. Based on its reading of the relevant case law, the court declined to award MidAmerica attorney fees in connection with the lawsuit. Charter One had argued that it was entitled to a setoff against MidAmerica because MidAmerica, as an assignee of ETI, inherited ETI's $50,000 liability to Charter One along with the right to enforce the $50,000 check against Charter One. However, because Charter One had failed to request a setoff in its pleadings, the court declined to award one. Charter One and MidAmerica both filed timely appeals.

In its appeal (case No. 2--07--0064), Charter One first argues that its refusal to honor its cashier's check was justified, because it accepted a stop payment order from Christelle. MidAmerica counters that Illinois law does not allow a bank to stop payment on a cashier's check and thus that Charter One's refusal to honor its check was not justified.

In support of its position, MidAmerica directs us to the decision in Able & Associates, Inc. v. Orchard Hill Farms of Illinois, Inc., 77 Ill. App. 3d 375 (1979). In Able, the court addressed the very question presented here: whether the law allows a bank to stop payment on a cashier's check. Able, 77 Ill. App. 3d at 377. The court in Able recognized a split of authority between cases, including one Illinois Appellate Court case that held that a bank could stop payment on a cashier's check "consistent with those provisions of the Uniform Commercial Code relat[ed] to holders in due

course," and cases that "adhere[d] to a contrary rule that cashier's checks are not, under any circumstances, subject to countermand by the issuing bank." Able, 77 Ill. App. 3d at 380. The court sided with the latter line of cases, and it explained its reasoning as follows:

> "It is clear that in Illinois, a cashier's check is regarded as accepted by the act of issuance. [Citations.] Further, under section 4--403 of the Uniform Commercial Code, a stop order is ineffective 'after the bank has *** accepted or certified the item.' (Ill. Rev. Stat. 1977, ch. 26, par. 4--303.)" Able, 77 Ill. App. 3d at 381.

Other courts clarified that this rule, that a cashier's check be considered accepted by the act of issuance, was based on language from the Code that "[a]cceptance is the drawee's signed engagement to honor the draft as presented" (Ill. Rev. Stat. 1977, ch. 26, par. 3--410(1)); these courts considered a bank officer's signature on a cashier's check as sufficient for acceptance under the quoted language. See Da Silva v. Sanders, 600 F. Supp. 1008, 1012 n.11 (D.C. 1984).

The Able court also argued that policy considerations favored its holding, because cashier's checks operate as the commercial equivalent of cash, and allowing a bank to stop payment (and thus renege on its guarantee to honor the check) would " 'undermine the public confidence in the bank and its checks and thereby deprive the cashier's check of the essential incident which makes it useful.' " Able, 77 Ill. App. 3d at 382, quoting National Newark & Essex Bank v. Giordano, 111 N.J. Super. 347, 351-52, 268 A.2d 327, 329 (1970).

The Able decision was consistent with Illinois case law preceding it. See, e.g., Gillespie v. Riley Management Corp., 59 Ill. 2d 211, 216 (1974) ("The cashier's check is substantially equivalent to a certified check in that neither generally can be countermanded and both circulate in the commercial world as primary obligations of the issuing bank as substitutes for the money

represented").  But see <u>Bank of Niles v. American State Bank</u>, 14 Ill. App. 3d 729 (1973) (departed from in <u>Able</u>).  The approach followed in <u>Able</u> came to be known as the "cash substitute" or "cash equivalency" approach, or the "acceptance approach."  See J. Carter, <u>Uniform Commercial Code: A Bank's Right to Dishonor a Cashier's Check</u>, 38 Okla. L. Rev. 359, 362 (1985) (hereinafter Carter) (discussing differing views to the problem presented in <u>Able</u>); B. Davis, <u>The Future of Cashier's Checks Under Revised Article 3 of the Uniform Commercial Code</u>, 27 Wake Forest L. Rev. 613, 621 (1992) (hereinafter Davis).

While Illinois followed the cash-equivalency approach described above, other jurisdictions followed a divergent approach that allowed a bank to dishonor its cashier's check where it could assert a defense that would be valid against enforcement of a note.  See <u>Bank One v. Northern Trust Bank</u>, 775 F. Supp. 266, 270 n.4 (N.D. Ill. 1991) (noting split between this approach and the Illinois approach); Carter, 38 Okla. L. Rev. at 364-65 (discussing two approaches under which courts treated cashier's checks as negotiable instruments instead of cash equivalents).  Proponents of this approach, which we term for purposes of this discussion the "note approach," criticized the cash-equivalency approach's reliance on the Code rule that a stop order may be issued only before acceptance (see Ill. Rev. Stat. 1977, ch. 26, par. 4--303(a)).  They argued that "the concept of stopping payment has relevance only to relations between a bank and its customer who draws a check against the bank" and, "since the bank, as drawer and drawee, is its own customer when it issues a cashier's check, it is nonsensical *** to speak of the bank's liability to itself for failing to stop payment on its own cashier's check."  <u>Da Silva</u>, 600 F. Supp. at 1012 (summarizing criticism).  Critics of the cash-equivalency approach also argued that it contravened section 3--118(a) of the Code, which provided that "[a] draft drawn on the drawer is effective as a note" (Ill. Rev. Stat. 1977, ch. 26, par. 3--118(a)).

Davis, 27 Wake Forest L. Rev. at 621 (criticizing approaches that treated cashier's checks as drafts instead of notes). These critics instead advocated for a position that would allow a bank to dishonor a cashier's check to the extent it had any defense that would be valid against a note. See Ill. Rev. Stat. 1977, ch. 26, pars. 3--305, 3--306 (defenses to honoring a note).

Most courts that reached this result did so in two different ways. Da Silva, 600 F. Supp. at 1011 (explaining various approaches). Some courts relied on section 3--118(a), quoted above, to hold that a cashier's check should be treated as a note. Da Silva, 600 F. Supp. at 1011. Other courts agreed with the premise from the cash-equivalency approach that a cashier's check could be considered a draft accepted by the act of issuance, but they argued that, under section 3--413(1) of the Code, an acceptor was bound in the same way as was a maker and thus should have the same defenses as a maker. Da Silva, 600 F. Supp. at 1011; see Ill. Rev. Stat. 1977, ch. 26, par. 3--413(1) ("The maker or acceptor engages that he will pay the instrument according to its tenor at the time of his engagement"); see also Davis, 27 Wake Forest L. Rev. at 622-23 (discussing this approach).

In an attempt to quell this dispute and provide uniformity to the treatment of cashier's checks, "the National Conference of Commissioners on Uniform State Laws and the American Law Institute completely revised Article 3 of the U.C.C." Davis, 27 Wake Forest L. Rev. at 614. Effective January 1, 1992, the Illinois General Assembly adopted the amendments to Article 3. R. Robertson, Survey of Illinois Law: Commercial Law, 17 S. Ill. U. L.J. 719, 725 (1993), citing Pub. Act 87--582, eff. January 1, 1992. Though MidAmerica urges that we follow the Able decision discussed above, Able predates the revision of the Code and is thus an imperfect guide for us here. However, we find ample guidance nonetheless in the plain language of the amended Code.

The current version of the Code (810 ILCS 5/1--101 et seq. (West 2002)) provides as follows, in pertinent part:

"The issuer of a note or cashier's check or other draft drawn on the drawer is obliged to pay the instrument *** according to its terms at the time it was issued ***. The obligation is owed to a person entitled to enforce the instrument or to an indorser who paid the instrument under Section 3--415." 810 ILCS 5/3--412 (West 2002).

Thus, the revised version of the Code treats a cashier's check as a note, and it rejects the cash-equivalency approach that many courts, including those in Illinois, followed. See Davis, 27 Wake Forest L. Rev. at 631 ("The theory that ultimately prevails under the revised Article 3, with important limitations ***, is that cashier's checks should be treated as demand notes, with the issuing bank making a contract equivalent to that of a maker of a note"). Since a cashier's check must be treated as a note, all of the defenses to enforcement of a note apply. See 810 ILCS 5/3--305 (West 2002).

We find further support under section 3--411 of the Code for the notion that a bank may dishonor a cashier's check under certain circumstances. Section 3--411 provides as follows:

"(a) In this Section, 'obligated bank' means the acceptor of a certified check or the issuer of a cashier's check or teller's check bought from the issuer.

(b) If the obligated bank wrongfully *** refuses to pay a cashier's check ***, the person asserting the right to enforce the check is entitled to compensation for expenses and loss of interest resulting from the nonpayment ***.

(c) Expenses *** under subsection (b) are not recoverable if the refusal of the obligated bank to pay occurs because (i) the bank suspends payments, (ii) the obligated bank asserts a claim or defense of the bank that it has reasonable grounds to believe is available

against the person entitled to enforce the instrument, (iii) the obligated bank has a reasonable doubt whether the person demanding payment is the person entitled to enforce the instrument, or (iv) payment is prohibited by law." 810 ILCS 5/3--411 (West 2002).

As Charter One observes, because the plain language of subsection (b) of section 3--411 limits the section to a situation in which a bank "wrongfully" refuses to pay a cashier's check, there must, by implication, be a situation in which a bank's refusal to pay a cashier's check is not wrongful.

Based on the above discussion, we accept Charter One's position that a bank may dishonor a cashier's check under certain circumstances. The question becomes whether any of those circumstances exist here.

Charter One first argues that it properly dishonored the check pursuant to section 3--312 of the Code, which discharges a bank's obligation to honor a cashier's check when a person who claims the right to receive the amount of a lost, destroyed, or stolen cashier's check files a written declaration of loss as part of an effort to recover the value of the check from the issuing bank. 810 ILCS 5/3--312 (West 2002). Even though no written declaration of loss appears in the record or was produced a trial, Charter One asserts that Christelle asserted such a claim here because, according to testimony at trial, "the only way that Charter One would have placed the stop payment order on the Cashier's Check is if Christelle had prepared and submitted to Charter One" a declaration of loss. Charter One thus argues that its stop payment order was valid. However, Charter One overlooks some important qualifications on the procedure outlined in section 3--312. A section 3--312 claim made to a bank "becomes enforceable at the later of (i) the time the claim is asserted, or (ii) the 90th day following the date of [a cashier's check]" (810 ILCS 5/3--312(b)(1) (West 2002)), and, "[u]ntil the claim becomes enforceable, it has no legal effect" (810 ILCS 5/3--312(b)(2) (West 2002)). Only

if "the claim becomes enforceable before the check is presented for payment" may the obligated bank avoid its obligation to pay the check. 810 ILCS 5/3--312(b)(3) (West 2002).

Section 3--312 allows a bank to pay a claimant the value of a lost cashier's check without fear of double liability in the event the original check resurfaces; the section is not, as Charter One implies, a blanket authorization for a bank to stop payment on a cashier's check upon the request of a customer. That said, even assuming that Christelle asserted a lost-check claim under section 3--312 when she asked Charter One to stop payment on the check four days after issuance (a dubious assumption, if for no other reason than that a request to stop payment on a check is quite different from the claim to the value of the check contemplated in section 3--312), the claim could have no legal effect until 90 days after the date of the check. See 810 ILCS 5/3--312(b)(2) (West 2002). By the time 90 days had passed, MidAmerica had presented the check to Charter One for payment, received the check back from Charter One, returned the check to ETI, and closed ETI's account. Section 3--312 did not authorize Charter One's decision to dishonor the cashier's check.

To the extent Charter One argues that a bank should have a broad right to stop payment on a cashier's check upon a request from the customer who purchased the check, we note that the current version of the Code appears designed to penalize just such a practice. See 810 ILCS Ann. 5/3--411, Uniform Commercial Code Comments--1992, at 239 (Smith-Hurd 1993) ("A debtor using [cashier's checks, teller's checks, or certified checks] has no right to stop payment. Nonetheless, some banks will refuse payment as an accommodation to a customer. Section 3--411 is designed to discourage this practice"); 810 ILCS Ann. 5/3--411, Uniform Commercial Code Comments--1992, at 239 (Smith-Hurd 1993) ("Subsection (c) provides that expenses *** are not recoverable if the refusal to pay is because of the reasons stated. The purpose is to limit that recovery to cases in which the bank

refuses to pay even though its obligation to pay is clear and it is able to pay. Subsection (b) applies only if the refusal to honor the check is wrongful. If the bank is not obliged to pay there is no recovery"); Davis, 27 Wake Forest L. Rev. at 639 ("the drafters included modifications to prevent banks from being too easily persuaded to dishonor the checks or from feeling compelled to do so upon a customer's request").[1]

Charter One also argues that MidAmerica should not now be able to enforce the cashier's check, because ETI procured it through fraud and MidAmerica, as assignee of ETI's interest in the check, stands in the shoes of ETI. Before addressing this argument, we must clarify precisely what right to enforcement is at issue. The parties base their written arguments at least partially on a dispute as to whether Charter One wrongfully dishonored the check at the time MidAmerica originally presented it. However, that dispute is not before us. Regardless of the propriety of Charter One's decision to dishonor the check, MidAmerica, upon having the check returned, removed the $50,000 credit from ETI's account and gave the check to ETI. (ETI's MidAmerica account later accrued a negative balance after subsequent checks deposited by ETI were dishonored due to insufficient funds.) MidAmerica did not suffer any damage as a result of the Charter One check. In a suit to recover the negative balance of ETI's account, MidAmerica was assigned ETI's right to

---

[1]MidAmerica relies on the committee comments to argue that an issuing bank may never refuse to pay a cashier's check. However, as demonstrated by our discussion above, the revised Code requires that cashier's checks be treated as notes, and thus defenses to the enforcement of notes apply. The committee comments do not indicate that a bank may never dishonor a check; they indicate that a bank should not try to stop payment on a check as an accommodation to a customer.

-10-

enforce the check. Therefore, the dispute before us is whether ETI has a current right to enforce the check against Charter One.

We turn to the Code to resolve the dispute. The Code defines a "[p]erson entitled to enforce" an instrument as, among other things, "the holder of the instrument." 810 ILCS 5/3--101 (West 2002). However, the Code also places limitations on a party's right to enforce an instrument:

"3--305. Defenses and claims in recoupment.

(a) Except as stated in subsection (b), the right to enforce the obligation of a party to pay an instrument is subject to the following:

(1) a defense of the obligor based on (i) infancy of the obligor to the extent it is a defense to a simple contract, (ii) duress, lack of legal capacity, or illegality of the transaction which, under the law, nullifies the obligation of the obligor, (iii) fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms, or (iv) discharge of the obligor in insolvency proceedings;

(2) a defense of the obligor stated in another Section of this Article or a defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract; and

(3) a claim in recoupment of the obligor against the original payee of the instrument if the claim arose from the transaction that gave rise to the instrument; but the claim of the obligor may be asserted against a transferee of the instrument only to reduce the amount owing on the instrument at the time the action is brought.

(b) The right of a holder in due course to enforce the obligation of a party to pay the instrument is subject to defenses of the obligor stated in subsection (a)(1), but is not subject to defenses of the obligor stated in subsection (a)(2) or claims in recoupment stated in subsection (a)(3) against a person other than the holder.

(c) Except as stated in subsection (d) [dealing with obligations of accommodation parties], in an action to enforce the obligation of a party to pay the instrument, the obligor may not assert against the person entitled to enforce the instrument a defense, claim in recoupment, or claim to the instrument (Section 3--306) of another person, but the other person's claim to the instrument may be asserted by the obligor if the other person is joined in the action and personally asserts the claim against the person entitled to enforce the instrument. An obligor is not obliged to pay the instrument if the person seeking enforcement of the instrument does not have rights of a holder in due course and the obligor proves that the instrument is a lost or stolen instrument." 810 ILCS 5/3--305(a), (b), (c) (West 2002).

As noted, Charter One asserts that MidAmerica has no right to enforce the cashier's check here because ETI obtained the check through a fraud on Charter One. MidAmerica counters by challenging the trial court's finding that ETI engaged in fraud. MidAmerica's argument on this point has three prongs. First, it argues that Charter One failed to plead fraud against ETI and therefore cannot now assert such fraud, regardless of the proof adduced at trial. Charter One does not respond to this argument in its reply brief. However, we note that, when the trial court found that ETI defrauded Charter One, it did so not to sustain liability against ETI but to establish a factual predicate to its ruling on the respective rights of MidAmerica and Charter One, because, as ETI's assignee,

MidAmerica's right to enforce the instrument coincided with ETI's right to enforce it. This question of fact was raised even if ETI was not a proper party to the suit.

Second, MidAmerica argues that the trial court lacked jurisdiction over ETI due to a failure of service of process, and, therefore, the trial court could not enter a finding of fraud against ETI. We reject this argument for the same reason we reject MidAmerica's first argument.

Third, MidAmerica argues that "absolutely no evidence was introduced by Charter One establishing that ETI was involved in the alleged check kiting scheme or that MidAmerica was aware of it." Of course, since the issue is whether ETI has a right to enforce the instrument, whether MidAmerica was aware of any fraud is irrelevant. That said, Charter One directs us to ample evidence to support the trial court's finding that ETI defrauded Charter One. The trial court heard evidence that Christelle's Charter One account had never had more than $5,000 in activity in a single month before January 2002, when the account value rose to over $100,000 before two $50,000 checks were returned for insufficient funds. There was also evidence that items were being deposited and withdrawn from Christelle's account for the same dollar amount in a very short period of time. Further, David Hernandez, an agent of ETI, asserted his fifth amendment privilege against self-incrimination when asked about allegations that he had manipulated Christelle's finances and when asked about ETI's financial transactions. As the trial court noted in its ruling, the cashier's check was made out to ETI, and thus ETI was poised to benefit from the check. We will not overturn a trial court's factual findings unless they are against the manifest weight of the evidence. E.g., Thomas v. Diener, 351 Ill. App. 3d 645, 652 (2004). In light of the evidence that supports the notion that ETI defrauded Charter One, we will not disturb the trial court's finding on that point. We therefore reject all three prongs of MidAmerica's challenge to the trial court's finding that ETI

procured the check by fraud through a check-kiting scheme, and we consider whether ETI (and thus its assignee, MidAmerica) may enforce the instrument after committing such fraud to obtain it.

The type of fraud at issue here, termed "fraud in the inducement," is a defense of the obligor under section 3--305(a)(2). J. White & R. Summers, Uniform Commercial Code §14--10, at 542-43 (5th ed. 2000). MidAmerica argues that, even if ETI committed fraud, Charter One may not assert fraud as a defense to enforcement because, pursuant to section 3--305(b), defenses of the obligor do not apply against holders in due course, a status MidAmerica ascribes to ETI. Section 2--203 of the Code provides a quick rejoinder to MidAmerica's argument:

> "Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course, but the transferee cannot acquire rights of a holder in due course by a transfer, directly or indirectly, from a holder in due course if the transferee engaged in fraud or illegality affecting the instrument." 810 ILCS 5/3--203(b) (West 2002).

Because the trial court found that ETI procured the cashier's check by fraud, ETI cannot claim the protection of holder-in-due-course status. Also because the trial court found that ETI procured the instrument by fraud, Charter One has a valid defense against ETI's right to enforce the instrument. Since MidAmerica stands in the shoes of ETI, Charter One's defense is also valid against MidAmerica's right to enforce the instrument. We must therefore reverse the trial court's ruling that Charter One was liable to MidAmerica (through ETI) for the value of the check.

In its appeal (case No. 2--07--0158), MidAmerica argues that the trial court erred by refusing to award it attorney fees for Charter One's wrongful refusal to pay on the cashier's check. However,

we hold above that MidAmerica, as an assignee of ETI, cannot enforce the cashier's check against Charter One. Therefore, we do not reach this issue.

For the foregoing reasons, we reverse the judgment of the circuit court of Du Page County holding that MidAmerica could enforce the cashier's check against Charter One. We affirm the trial court's decision not to award attorney fees to MidAmerica.

No. 2--07--0064, Reversed.

No. 2--07--0158, Affirmed.

BYRNE, P.J., and ZENOFF, J., concur.